10 F.Supp. 497 (1935)
THE R. LENAHAN.
THE ALBANY.
RUSH
v.
DELAWARE & CHESAPEAKE S. S. CO.
Nos. 79, 81, 83, 85, 87, 89.
District Court, E. D. Pennsylvania.
March 27, 1935.
Reargument Denied April 18, 1935.
Hunt, Hill & Betts, of New York City (John W. Crandall and Frank J. Zito, both of New York City, of counsel), and Rawle & Henderson, of Philadelphia, Pa. (Joseph W. Henderson and Thomas F. Mount, both of Philadelphia, Pa., of counsel), for libelants Stemmler & Co.
Howard M. Long, of Philadelphia, Pa., for Atlantic Refining Co.
Charles B. Downs, of Philadelphia, Pa., for Kensington Shipyard & Drydock Corporation.
DICKINSON, District Judge.
Leave was given to file briefs, and subsequently supplemental, and again reply, briefs. These have now been submitted and the cause ripe for a ruling.
The Fact Situation and General Findings.
The questions here raised are in some respects novel and call for a somewhat extended discussion. The genius of the law maritime makes of a vessel a sentient being having the needs of its existence and support and endowed with capacity to pledge itself, its tackle, earned freight, and, on occasion, even its cargo, by way of general average. It may borrow money on bottomry bonds to pay for its conditioning and repair in order to resume its voyaging and activities. *498 It is thus a source of credit to itself, which may be necessary to its very preservation and existence. Creditors to whom such a pledge is given have claims prior in payment to those who have investments in the vessel venture. These claims such creditors could enforce.
The Ship Mortgage Act of June 5, 1920 (46 USCA § 911 et seq.) made a profound change in the law maritime. The capital of any one engaged in any business may consist of capital ventures by those who thus become owners and also by those whose investments take the form of bonds or other debt obligations, secured by a mortgage of some or all of the property of the mortgagor.
The former type of capital is subordinated to the claims of creditors of the owner, but the latter is often given a preferred claim upon the pledged property. The supply of this type of capital to a marine venture is not founded upon a maritime contract within the meaning of the Admiralty Law. One of the things which the Ship Mortgage Act was meant to do was to make these maritime contracts. Its very laudable purpose was declared to be to benefit our merchant marine. It sought to do this by encouraging the investment of this form of capital by giving to the mortgagees of ships a preferred lien (with a few exceptions) upon the mortgaged ships. The credit extended to ships is likewise a source and form of capital. It is to be hoped that the effect of the Ship Mortgage Act will not be to deprive shipping ventures of the greater capital which the ship's credit supplied. It would be expected that a mortgaged ship would lose the credit which would otherwise be extended to her, and this lost credit might exceed the capital derived from the preferred mortgage contributions. The preferred mortgage plan is undoubtedly an extension, or at least a change, of the law maritime. It provides for the enforcement of such mortgages through a foreclosure proceeding. The question at once arose whether such foreclosure proceedings could be brought within the jurisdiction of Courts of Admiralty, inasmuch as such mortgages were not before known to the law maritime. This question has been set at rest by the case of Detroit v. The Thomas Barlum, 293 U. S. 21, 55 S. Ct. 31.
This type of mortgage has, by the Act of Congress, been incorporated into our maritime law. A regrettable effect is to subject shipping activities to the danger of a scheme which has resulted in untold evil in other business activities. The evil has reached colossal proportions in hotel, apartment house and office building and many other operations. Efforts are now being made to find a remedy as the scheme has become a national scandal and has called for a congressional investigation. The scheme is simplicity itself. It is for the promoters to plan an extensive construction which may be subjected to a mortgage. It is planned to create the mortgage for a sum for which the property is good security and yet so large that in case of a sale the property can be bought in under it. Such a mortgage is executed to the promoters for all they invest plus a very generous margin for their profits. The gullible are then plied by every art to invest in the venture. They are given bonds supposed to be secured by a second mortgage or are given beautifully embossed certificates of preferred stock. The bait is a large promised profit. There is usually a lavish issue of common stock to investors in the second mortgage bonds and preferred stock, but the promoters retain control of the management through holding the major part of the common or voting stock. The promoters have risked nothing. Their entire investment, if any, and high profits, are secured by the first mortgage. When the time comes to spring the trap, the first mortgage is foreclosed, taking everything, and all others get nothing. This is no fancy picture but what is happening every day and every where. This is the scheme charged to be behind these preferred mortgages.
The facts of this case can be best presented through a series of findings, which we make:
1. Stemmler & Co. were investment bankers. Some changes were made in the course of the transactions, but we treat them as alone concerned from the beginning. They became interested in the marine venture of cargo carrying by water from the port of Philadelphia to Kinsale, Va. They were to supply the needed capital and were willing to invest $30,000.
2. A corporation, given the name of the Delaware & Chesapeake Steamship Company, was chartered under the laws of the state of Delaware. Its entire capital stock was represented by an issue of 3,000 shares of the type known as "no par value" stock. The charter date is August 21, 1934.
3. About the same time the two barges, known to this record as the Albany and R. *499 Lenahan, were purchased, the one for $9,000, and the other for $10,000, or $19,000 in all. Checks for the payment were the checks of Stemmler & Co. direct to the vendors, but the bills of sale of the boats were made to the corporation.
4. On August 23, 1934, a formal meeting of the incorporators was held, Stemmler presiding as chairman, at which a formal offer was made by Stemmler that in consideration of the issue to Stemmler & Co. of 3,000 shares of the stock of the company (the entire stock issue), and the execution of two notes for $15,000 each payable in six months, secured by "two preferred mortgages" of $30,000 each on the boats Lenahan and Albany respectively. Stemmler & Co. would transfer title to the boats and give the company $11,000. The offer was formally accepted by the company. It may be noted for whatever this truth is worth that the offer was made by Stemmler to himself and accepted by him. It will be further noted that the entire capital of the corporation became borrowed capital and the company without any means of payment agreed to repay the $30,000 in six months.
5. The mortgages for $30,000 each on the Albany and Lenahan were dated August 24 and August 27, 1934, respectively, and the two notes for $15,000 each were given about the same time. When these were given Stemmler & Co. had paid out something above $21,000 or $22,000. It is not denied that they afterwards advanced the full $30,000 or more.
6. Each mortgage was not only for $30,000 or for $60,000 in all, but they pledged not only the vessel, but all freight earnings as well. Opposing counsel attach importance to this latter feature.
7. We have assumed, without inquiring into it, that there has been compliance with the formalities of foreclosure.
8. In making the following fact finding, we have had in mind that the mortgagees are bankers with a banker's idea of his rights and the measure of consideration he owes to others.
The Ship Mortgage Act attempts to afford some measure of protection to those dealing with mortgaged ships by giving them notice of the existence of the mortgage. This purpose was thwarted by the acts of the mortgagees in this case. The act, for instance, requires that the mortgage be recorded so as to give at least constructive notice of its existence. The plain intent of the act is to have this record easily accessible to prospective creditors. The record must be in the home port of the vessel. The owner here is a Delaware corporation. The port from which the vessels were to sail was Philadelphia. The credit asked for would be expected to be from Philadelphia merchants. What may be called the natural home port of the vessels would hence be Wilmington or Philadelphia. Had the mortgages been recorded in Philadelphia, their existence would likely have become known. Instead of this being made the home port, that of New York was selected. It is impossible to escape the at least suspicion, in view of the whole conduct of the mortgagees, that the home port was made New York purposely in the hope that actual knowledge of the existence of the mortgage would thereby be concealed. In their eagerness to have a distant port made the home port of the vessels, the mortgagees recorded the mortgage before the formalities of designating a home port had been complied with. The required approval of the Commissioner of Navigation of the Department of Commerce had not been made when the mortgages were recorded. It was, however, afterwards given. As a further assurance that the existence of the mortgage would be disclosed, a copy of the mortgage is required to be kept among the ship's papers, and, although we cannot find this to be expressly required by the act, notices of the mortgage are expected to be posted on the ship. In this case all such information was purposefully withheld and the existence of the mortgages concealed. Notices were prepared for posting, but were never displayed. It is true that the duty of giving this notice is not imposed upon the mortgagees, but upon the mortgagor, and in some measure upon the Collector of the Port. If the duty is not imposed upon a mortgagee to give this notice, he is not bound to give it, but he is bound not to make himself a party to the fraud of the mortgagor by aiding in its perpetration. One of whom inquiry is made of the credit of a prospective debtor is often placed in a delicate and sometimes embarrassing situation if it is to his interest to have the credit extended. It is always his duty to speak the truth in what he says. It is not always his duty to tell all he knows. Sometimes, however, it is his duty to speak, as his silence may be misleading and may be found to have been intentionally so. To say of a person asking for credit that he is the owner of a valuable property, but to withhold the fact that the person inquired of holds a mortgage against it for all it is *500 worth, is a misleading statement. To withhold information both of the property and the mortgage may not be. As the corporation was a new one, inquiry into its financial standing was to be expected. Inquirers were referred to Stemmler. His answers were partly oral and in part in writing. The latter make painful reading. They are on their face a studied effort to avoid committing the writer to anything, and yet lead the inquirer to believe that the corporation had ample capital and financial resources. The fact is emphasized, as a source of credit, that the corporation owned two valuable vessels, yet not a word is said of the mortgages Stemmler held. It is true that he has testified that he told inquirers of the mortgages. The fact is, however, found to be otherwise. Evidently, in making his statement, he was testifying not to the fact, but to his then inference. When testifying, he appreciated that he should have mentioned the mortgages. He, because of this, infers that he did mention them. The inference is unjustified and the fact otherwise. He led inquirers to believe that the corporation had ample capital resources and sought credit merely "as a convenience," when he knew it had no free capital whatever.
In adverting to this feature of the case, we have in mind that a mortgagee might subject himself to an action for deceit by false statements made without losing any of his rights as mortgagee. What the mortgagees did is of significance only in its bearing upon the question of whether the mortgages they hold are "preferred" mortgages within the meaning of the act making of them maritime contracts.
As bearing upon this, we make these findings. One is that Stemmler & Co. agreed to make a capital contribution of $30,000 to this corporation for which there was issued to them 3,000 shares (the entire issue) of the capital stock of the company. As such capital contribution, the investment depended upon the success of the adventure. In the attempt to assure themselves against all possible business losses, they, acting for the corporation, gave to themselves these mortgages. The other is that, seeking to comply in form with the requirements of the act, as to giving notice of the existence of the mortgages, they successfully concealed all knowledge in fact of the mortgages from those dealing with the vessels on their credit.
9. This takes us to the procedural features of the act.
The mortgagees have filed two libels directed against each of these vessels to recover $30,000 for the claim based upon each mortgage. Viewed as simply a foreclosure proceeding to which the mortgagees and mortgagor were alone parties, the mortgages would undoubtedly be at least prima facie evidence of the mortgage debt which, if unanswered, would give the right to a decree in libelant's favor. Such was the case, as viewed by the libelants. They rested their case (in this feature of it) upon the offer of the mortgages in evidence. The proceeding, however, is much more than a mere foreclosure proceeding. Other parties had first filed libels and caused the vessels to be seized. All the libel proceedings were consolidated and the other libelants answered to the mortgage libels. The owner of the vessels has offered no defense to any of the libels and no defense has been interposed to any except the two mortgage libels. We thus have an issue as it would be between two claimants upon a fund, each of whom asserts a prior lien. What it comes to in practical effect is that, if these mortgagees are valid "preferred" mortgagees within the meaning of the Ship Mortgage Act, they take the whole fund. Otherwise the other libel claims must be paid thereout. This then presents the issue which is one not between the mortgagees and their mortgagor, but between the mortgagees and the other libelants.

Discussion.
The mortgage libelants hold two mortgages, each of different vessels, but each for $30,000. On the face of the mortgages they have the right to awards aggregating $60,000. We are saved the decision of the question of whether these mortgages, while evidence of the mortgage debt against the mortgagor, would be evidence of the debt against other parties, or be as to them res inter alios acta, because opposing counsel has brought out that there is a debt for $30,000 which, as we understand it, is all the mortgagees are claiming. The question then becomes that, having a mortgage to secure a $30,000 claim of debt, is the mortgage a valid "preferred" mortgage, within the meaning of the act of Congress, against the other libelants? What is the kind of mortgage which is thus given priority?
Before discussing the conditions imposed by the act of Congress in terms, we have a broad underlying question to answer. It is this: A man makes a capital contribution *501 to a corporation of say $30,000, receiving therefor 3,000 shares, being all of its capital stock. He, then being practically the corporation, has it execute a mortgage to himself for $30,000 without other consideration. If the mortgaged property is brought into court charged with the lien of the mortgage and also with other liens to creditors, will the mortgagee be awarded a preferred lien upon the property? We are propounding this as a general question without the Act of Congress, although without it such a claim would not give a maritime lien. The question admits only of the answer that as against lien creditors of the corporation the mortgage would be without consideration and a nullity. How is it under the act? The act authorizes the mortgaging of vessel property, but provides that, although such mortgages are good as against the mortgagor "and a person having actual notice thereof," (46 USCA § 921) they are invalid as against "any person other than" the mortgagor and those having actual notice of the existence of the mortgage, unless the mortgage is recorded with the Collector of Customs in the home port of the vessel. The home port can be designated only with the approval of the Commissioner of Navigation of the Department of Commerce. These mortgages were not so recorded. It is true they were deposited with the Collector of Customs of the Port of New York, but that port had not at that time been designated as the home port of the vessels. It is likewise true that New York was afterwards designated as such home port.
We do not think there was in this a compliance with the requirements of the act. What is sought to be done is to visit upon creditors constructive notice of the mortgages. A compliance with the act would be such constructive notice, but something else would not be. In re Empire Shipbuilding Co. (C. C. A.) 221 F. 223; The Underwriter (D. C.) 3 F.(2d) 483; The Jean L (D. C.) 286 F. 727; The Susana (C. C. A.) 2 F.(2d) 410.
We pass without a specific ruling the effect of the requirement of the indorsement of the mortgage upon the ship's papers where the mortgagee has been a party to the hiding of this notice.
The provision, in case other property than the vessel is included in the mortgage, is under the facts of this case somewhat difficult to construe. There was a pledge here, not only of the vessel, but of freight earned and to be earned. Obviously no freight had been earned, and just as obviously future earnings could not be apportioned. Freight earnings are a part of the vessel as much as the ship's tackle. This is true, however, only of freight earned. There is authority for the proposition that the value of mortgaged property suffered by the mortgagee to go to the mortgagor may, in favor of another lien creditor, be deducted from the mortgage debt. The Red Lion (D. C.) 22 F. (2d) 329.
There is no evidence, however, that any earned freights were either applied to the mortgage or released to the mortgagor. The practical effect of mortgaging each vessel separately for the whole $30,000 mortgage debt was to make of each mortgage one of a pledge of both vessels for the $30,000 debt.
We refuse to hold that there was here any property pledged "other than a vessel" within the meaning of clause "e" of § 30, subsec. D of the Act (46 USCA § 922 (e). We do hold, however, that the mortgages in suit are not "preferred" mortgages within the meaning of the act of Congress as against the other libelants. There remains only the other libels.
The discussion has already been extended to a tiresome length. The claims of the other libelants are not disputed and have been decreed pro confesso, and may be allowed with a single comment. Libelants for supplies, etc., are now relieved from averring or proving that the supplies were furnished on the credit of the vessel. That, none the less, is still the basis for a libel in rem. If the debt was contracted on the personal credit of the one who contracted the debt, no lien can be successfully asserted. Here in its zeal to visit bad faith upon the mortgagee in the contraction of the debt, one of the libelants has come dangerously near to a waiving of its otherwise lien against the vessel. This is because one of the expressions used might be construed as a statement that the debt was contracted wholly upon the personal credit of the owner and in nowise upon the credit of the vessel.
We construe this expression, however, as meaning that the libelant furnished supplies to the vessel on its credit, and, in consequence, acquired a lien. The enforcement of such a lien is, however, troublesome and expensive. They, because of this, inquired into the additional financial ability and credit of the owner without waiving their lien against the vessel.
The claims are all allowed.
*502 There are a number of these libels.
We accordingly grant leave to the proctors concerned to submit formal judgments disposing of the several claims and the cause in accordance with this opinion, retaining jurisdiction of the cause for the purpose of entering final judgments.

On Motion for Reargument.
Leave was given to reargue the merits of the cause on the argument in support of this motion.
It is urged upon us that the opinion filed does grave injustice to Stemmler & Co. in that it finds them guilty of bad faith and a purpose to defraud when in truth "they rather than bilking others have themselves been bilked." This is a misunderstanding of our opinion which we hasten to correct. We had no thought of charging them with any intention to defraud others. In fact, we expressly disclaimed any finding upon this feature of the case because we thought it foreign to a ruling upon the real question of whether these mortgages were "preferred mortgages" under the Ship Mortgage Act (46 USCA § 911 et seq.). We characterized Stemmler & Co. as investment bankers of the highest standing who, in doing what they did, had acted in accordance with the standard of bankers, all of whom have a banker's notion of their rights and of the consideration which they owe to others. We did characterize them as bankers, but did so without thought of imputing to them any iniquity by so doing. We do not suppose they resent this. Not that it is of any importance, but merely as evidence that we intended no reflection upon them, we add that for many years, beginning more than half a century ago, we sat at a bankers' board and represented banks as counsel. As a consequence we are sympathetic with them, and add that if there is any class of men who should command the sympathy of all right-minded persons, it is those who have had banking managerial responsibilities during the last six or seven hectic years. No man should be criticized for observing the standards of his own day and generation, and there is nothing more unjust than to judge a man of one generation by the standards of another. We had no more thought of charging the Stemmler Company with an intention to "bilk" others than with an intention to "bilk" themselves. Counsel has said that they have been "bilked," which we do not doubt. It is just as true if they are given a "preferred" status others will be "bilked." This is not because Stemmler & Co. intended or planned either result but both are the consequences of what they did. It is said that injustice is done them by the finding that they were the promoters of the business scheme which is resulting in this loss to all. We expressly found that they were not the originators of it, but as they succeeded to the rights of the others we would treat them as such from the beginning. This was merely for brevity of statement.
We restate our findings on this branch of the case.
The project of establishing the line of carrying vessels which was established and the creation of the Delaware & Chesapeake Steamship Company did not originate with Stemmler & Co. They were invited to invest in it. They had as associates a man by the name of Harrison and Ingalls & Co. and others. The Stemmlers expected to invest $15,000. This they were willing to do. They wished of course to safeguard their investment. We are told that they did only what they had "both the legal and moral right to do." We do not assume any judicial duty or power to pass upon the ethics of their conduct. Thus far, however, they were clearly within their legal rights. A sum of at least $30,000 was needed to buy the vessels to start the project going. The plan devised was that Ingalls & Co. and the Stemmlers were to put up $15,000 each. What other moneys were needed were presumedly to be put up by the others. The plan of doing this is in writing. The Steamship Company organized had capital stock of the type known as no par value. There were 3,000 of the shares. This constituted its only free capital and the whole of it. The Stemmlers and their associates stipulated for the control of the company. The plan was spread upon the minutes. It was that they were to be the managing officers of the company and in consideration of the $30,000 capital contribution were to receive the entire issue of the 3,000 shares, the share of the Stemmlers being at that time, 1,502 shares which it will be observed was a controlling interest. The company was to buy the two carrying barges with which this record concerns itself, which could be done for $30,000, $19,000 for one and $11,000 for the other. The only means for paying for this was this $30,000 capital contribution. In addition to the issue of the 3,000 shares of stock, the contributors were to be given two "preferred" mortgages aggregating *503 $60,000, one for $30,000 on each vessel. Mortgages were subsequently given over which this controversy has arisen. This was arranged for at a stockholders' meeting at which the contributors were alone present. In other words, they as the company made the mortgages to themselves as mortgagees. It may be the vessels had already been purchased. The chronological order we have not thought to be of importance enough to verify. Ingalls & Co. were unable to put up their share of this capital contribution. The Stemmlers loaned them $15,000 on the pledge of collateral and a banker's share of their stock holdings for the accommodation. Later the Ingalls dropped out altogether, turning over to the Stemmlers all their stockholdings. The latter put up the $30,000 in purchase of the vessels by paying the purchase price directly to the sellers. Later they advanced in payments for the company $7,500 more, part of which was for the insurance of the mortgaged vessels. Subsequently they claimed to have advanced, and doubtless did, $3,500 more, making their total investment $41,000. For this they held shares of stock in the company and the two mortgages of $30,000 each, and a debt claim of $11,000. Vessels are property and as such may be pledged by mortgage or otherwise for any debt of the owner. Such debts, however, may not arise out of a maritime contract unless bottomry bonds or the like. The acts of Congress provide that they are nullities except as against the mortgagors and those having knowledge of them. The payment of such pledges were not enforced in admiralty because the admiralty courts had no jurisdiction. They might, however, be foreclosed in equity. By the Ship Mortgage Act (46 USCA § 911 et seq.) such contracts were made to be contracts maritime and such mortgages made "preferred mortgages." They were such, however, only when there had been compliance with the provisions of the act. If valid preferred mortgages they may be foreclosed in admiralty.
Such are the cases before us, and the question is: Are they such preferred mortgages? The only bearing the conduct of the mortgagees, in their contacts with the other libelants, has is upon the question of actual notice to the latter of these mortgages. To this we restricted our findings and comments. Stemmler testified that he had so notified at least one of the libelants. We found the fact to be otherwise, and that he was mistaken in this, but that he and Ingalls had carefully refrained from giving this information and had withheld it. We did use the phrase that this would give rise to at least a suspicion that, as it was to their interest that the vessels be given the credit asked to be extended and as knowledge of the mortgages would have destroyed that credit, this information was purposely withheld. We were careful to add, however, that they were placed by the inquiries in a delicate position. They as bankers would feel that they had no right to disclose the existence of the mortgages to the possible prejudice of their debtors. They were careful not to say there were no mortgages, but they did say in effect that the Steamship Company was worthy of credit because among other things it owned these vessels, not disclosing that they held mortgages against them for more than the vessels were worth. This is what we meant by the comment that this was in accord with the banking standard of the consideration they are bound to show to others. The very device of mortgaging each vessel for $30,000 was effective in holding off other creditors. If either of them was libeled, the libel would be behind the mortgage if a valid preferred lien.
We do not find this was intended to hinder creditors because the Ship Mortgage Act (46 USCA § 922) requires an affidavit to be filed denying any such purpose, and counsel probably had advised what was done. Although we do not find this to have been the intent, such was the effect. We based our ruling, not upon a finding of fraud upon which we expressly refrained from making a finding, but upon the legal ground of a failure to comply with the requirements of the act. One of the requirements is that the mortgage must have been recorded in the home port of the mortgaged vessel. If it was so recorded, there has not only been a compliance with the act, but this recording is constructive notice to all dealing with the mortgaged vessel and every one is conclusively presumed to know of the existence of the mortgage. The home port is defined by the acts of Congress. The enrollment and registry shall be at the port nearest to the residence of the owner. The home port may be "fixed" by the owner, but this determination is subject to the approval of the Commissioner of Navigation. These mortgages were not recorded in the home port of the vessels. They were recorded in New York and this *504 had not been made the home port at that time. It is true that it was afterwards made the home port with the approval of the Commissioner. Was this a compliance with the act?
We have had cited to us the case of The Fort Orange (D. C.) reported in 5 F. Supp. 833, in which the opinion was delivered by Judge Knox. This case was among many cited to us on the first argument. We made no reference to the opinion. This calls for a word of explanation. It is needless to say that we share the high esteem in which Judge Knox is held by all as a jurist. We did not refer to his opinion for the simple reason that it escaped our attention. This was again because the point upon which we ruled the case was not made at the first argument. It was casually mentioned by the proctors for the mortgagees but merely as one of the features of the act, with all of which they claimed to have complied. The opinion of Judge Knox is necessarily a very lengthy one. The report of the case takes up fifteen closely printed pages. This is because the case before Judge Knox was very complex requiring him to deal with a number of controverted questions. His discussion, as is true of all his opinions, is exceptionally lucid and thorough going.
The same point raised in the instant case was raised in The Fort Orange Case. Judge Knox ruled in that case that the filing of the formal approval of the Commissioner need not precede the recording of the mortgage, if this was done, as in his case it was, within three days after the recording. His opinion, however, contains this significant language: "In this case the Commissioner had orally approved the choice of a home port for the vessels prior to the recordation of the papers. His written approval was forthcoming within three days thereafter." He had previously discussed a similar point made respecting the documentation of the vessel there concerned in order to make it "capable of being denominated `a vessel of the United States.'" There the papers had all been filed the same day with an interval of minutes only between them. There was no requirement that the time of filing be noted. The case was in consequence within the doctrine that the law, unless there is a reason for holding otherwise, regards a day as a unit of time, and that a paper filed on the last minute is filed as soon as one on the first minute. The act of Congress does not require the approval of the Commissioner to be in any prescribed form, written or otherwise. There had in his case been such approval, in fact, before the recording of the mortgage, and Judge Knox held that to be sufficient. Here there was no such approval in fact until after the recording. We can appreciate the advantage to mortgagees of the rule contended for that the approval is a "condition subsequent" and may be procured at any time. The truth remains, however, that we are dealing with constructive notice as a substitute for actual notice. The law is well settled, as Judge Knox himself shows, and as the cases cited in our former opinion abundantly establish that there can be no constructive notice except such as the law prescribes. The Ship Mortgage Act (46 USCA § 921) requires that the mortgage shall be recorded in the home port of the vessel, and the place of record here was not such home port. The complaint of the mortgagee is that if the recording of the mortgage awaited the designation of the home port that supply or repair libelants might secure a lien which would have priority to the recorded mortgage. So indeed they might. The remedy is to have the home port first fixed and then mortgage the vessel. Assume a claim which acquired a lien in the interval between the recording of the mortgage and the approval of the designation of the home port. Would such a libelant have constructive notice of such a mortgage? It is difficult to understand that he would. We would then have a mortgage which was a preferred mortgage as against some libelants but not as against others.
The motion for a reargument is denied.