**PORT WELCOME CRUISES, INC.**

v.

**S. S. BAY BELLE.**

**WILSON LINES, INC. (formerly Wilson Excursion Lines, Inc.)**

and

**ABC Vending Corporation**

v.

**S. S. BAY BELLE.**

James McCONNELL, trading as McConnell Fuel Oil Co.

v.

**S. S. JOHN A. MESECK.**

**WILSON LINES, INC. (formerly Wilson Excursion Lines, Inc.)**

and

**ABC Vending Corporation**

v.

**S. S. JOHN A. MESECK.**

Nos. 4351, 4361, 4357, 4364.

United States District Court
D. Maryland.
Feb. 26, 1963.

L. Vernon Miller, Baltimore, Md., David H. Rosenbluth, Philadelphia, Pa., and Piper & Marbury, Baltimore, Md., for Wilson Lines, Inc.

L. Vernon Miller, Baltimore, Md., Gilbert W. Oswald, Philadelphia, Pa., and Piper & Marbury, Baltimore, Md., for ABC Vending Corporation.

Joseph I. Huesman and Lerch & Huesman, Baltimore, Md., for Port Welcome Cruises, Inc.

John J. O'Connor, Jr., and Peter J. Ladzinski, Baltimore, Md., for Jackson and Warner.

Francis B. Burch, City Sol., George W. Baker, Jr., Deputy City Sol., and James B. Murphy, Asst. City Sol., for Mayor and City Council of Baltimore.

Solomon B. Levin, Baltimore, Md., for Humble Oil & Refining Co.

Harry Singerman, Baltimore, Md., for Meadowgold Ice Cream Co.

Sanford A. Harris, and Sagner, Stevan & Harris, Baltimore, Md., for Sealtest Foods Division of National Dairy Products Corporation.

Marvin C. Wahl, Baltimore, Md., for James McConnell, trading as McConnell Fuel Oil Co.

Marvin C. Wahl, Baltimore, Md., for Carmen Santonello, trading as Santel Linen Service.

WINTER, District Judge.

Nos. 4361 and 4364 are libels to foreclose ship mortgages on the S. S. "BAY BELLE" and S. S. "JOHN A. MESECK," respectively. The mortgages are alleged to be "preferred mortgages" pursuant to the provisions of the Ship Mortgage Act of 1920, 46 U.S.C.A. § 911 et seq. Nos. 4351 and 4357 are libels in rem against the S. S. "BAY BELLE" and S. S. "JOHN A. MESECK," respectively, by alleged maritime lienors to foreclose their respective items. The libels against the S. S. "BAY BELLE" were consolidated, and additional claims alleging maritime liens were filed against the vessel. The libels against the S. S. "JOHN A. MESECK" were consolidated, and additional

claims alleging maritime liens were filed against the vessel. The two consolidated actions were further consolidated, for purposes of the hearing, and will be decided together in this opinion.

The cases involve principally a contest between the mortgagees and other alleged maritime lienors, who became so subsequent to the execution, etc., of the mortgage, as required by the Act, as to whether the mortgages are preferred ship mortgages, and entitled to priority of payment, except to the extent that the other claimed liens are preferred because based on wages or torts.[1] Other than the mortgages, the claims against the ships, together with a general description of their nature, are as follows:

S. S. "BAY BELLE"

1. Port Welcome Cruises, Inc.
 For wharfage, gas, electricity, water and fuel oil for period May 15, 1961, to December 3, 1961 — $ 1,599.22

2. Frank Jackson and Harry B. Warner
 For wages for period February 1, 1962, through March 15, 1962 ($430.00 each) — 860.00

3. Mayor and City Council of Baltimore
 For wharfage during period January 1, 1962, to April 1, 1962 — 6,000.00

4. Humble Oil & Refining Company
 For fuel oil during the period August 1, 1961, through September 25, 1961 — 5,386.95

 Total claims against "BAY BELLE" — $13,846.17

S. S. "JOHN A. MESECK"

James McConnell, trading as McConnell Fuel Oil Co. for fuel supplied said vessel during period May 18, 1961, to September 6, 1961 — $ 7,905.24
Santel Linen Service, for linens and uniforms — 1,169.47

 Total claims against "MESECK" — $ 9,074.71

Thirty days after the cases were argued and submitted, an additional intervening libel was filed on behalf of Sealtest Foods Division of National Dairy Products Corporation, against the S. S. "BAY BELLE" for milk products sold and delivered to the vessel during the months of August and September, 1961, in the gross amount of $347.14.

FACTS:

By an agreement, dated March 30, 1961, Wilson Excursion Lines, Inc. (subsequently known as Wilson Lines, Inc., and hereafter called "Wilson"), agreed to sell to Wilson Steamship Corporation (hereafter called "Steamship"), four vessels, including the S. S. "BAY BELLE" and the S. S. "JOHN A. MESECK," certain real estate in Kent County, known as Tolchester Park, certain real estate in Pennsville, New Jersey, known as Riverview Beach Park, and all other assets, franchises, leases, furniture, etc., which Wilson owned in Baltimore, Boston, New York and Philadelphia in connection with its excursion boat operations there. The

---

1. Section 30 of the Act, 46 U.S.C.A. § 953, provides, *inter alia*, that liens arising subsequent in time to the lien of a "preferred mortgage" arising out of tort or for wages of the crew shall, nevertheless, have priority over the lien of such mortgage.

total consideration fixed was $1,400,000.-00, and the agreement assigned certain portions of the consideration to each of the items sold. So far as pertinent, the consideration for the S. S. "BAY BELLE" was designated to be $50,000.-00, for the S. S. "JOHN A. MESECK" $230,000.00 for Tolchester Park $100,-000.00, and for Riverview Park $200,-000.00.

The agreement recited that a deposit of $140,000.00 was made, and that at the closing—fixed for April 14, 1961—cash in the amount of $760,000.00 would be paid, and that Steamship would give Wilson a note in the principal amount of $500,-000.00, maturing in ten years and bearing interest at the rate of 5% per annum, payable quarterly. The note was to be secured by first preferred ship mortgages covering each vessel, purchase money mortgages on each of the amusement parks and a pledge of all of the assets of Steamship.

Notwithstanding that the agreement recited that Wilson would sell Riverview to Steamship, the agreement recited that Wilson did not have title to Riverview, but that it had a right to receive title. It was agreed that if at the time of closing Wilson had not yet received title to this amusement park its obligation to transfer title would be postponed until such time as it received title, but that, thereafter, it would immediately transfer such title.

The agreement contained other elaborate provisions generally required in a transaction of this magnitude, including a summary of certain other provisions to be included in the ship mortgages to secure the note for $500,000.00.

As originally drafted, the agreement contemplated that all of the issued and outstanding capital stock of Steamship would be pledged to secure the debt to Wilson, but, at or about the time of execution, the agreement was amended, by initialed interlineations, to convert this covenant into one to pledge all of the other assets of Steamship conveyed by Wilson besides the four vessels and the two amusement parks.

The closing did not take place on April 14, as specified in the agreement. On that date there was a dry run in New York City, but, because some of the documents required amendment, the actual closing took place on April 17, 1961, the following Monday, in Wilmington, Delaware. At the closing there was brought into the transaction ABC Vending Corporation (hereafter called ABC), from which Steamship had arranged to borrow the sum of $1,000,000.00, $900,000.00 of which was used to meet the total cash payment required, and the balance to be retained by Steamship for use as working capital. The $1,000,000.00 loan from ABC was evidenced by a note almost identical to the form of note given to Wilson to secure the $500,000.00 unpaid balance of the purchase price, and the ABC note as originally contemplated, was secured by the mortgages aforementioned on the several vessels, including the S. S. "BAY BELLE" and the S. S. "JOHN A. MESECK," in which Wilson and ABC were named as mortgagees *pari passu.*

At the time of closing, Wilson had not yet acquired title to Riverview, and it was agreed that the transfer of title would take place at a future date, when Wilson acquired title. Also at the time of closing, there was a modification of the March 30, 1961 agreement. Because the stock of Steamship was then owned by Mr. and Mrs. Joseph Goldstein, Mr. Goldstein, who attended the closing, with the advice of his attorney, concluded that it would be preferable to pledge the stock of Steamship, as contemplated in the original draft of March 30, 1961 agreement, rather than to mortgage or pledge its assets. The substitution was agreeable to the other parties, and an appropriate pledge agreement was prepared and signed by Mr. Goldstein. Mrs. Goldstein was not present at the closing and it was understood that she would sign the pledge agreement at a later date. However, Mrs. Goldstein has never signed the pledge agreement.

Mr. and Mrs. Goldstein personally guaranteed the note to ABC and, as additional security, there was assigned to

ABC life insurance policies on Mr. Goldstein's life, having a value upon his death in the amount of $500,000.00 (the cash surrender value of which was not proved), and his ⅖ths interest in the intestate estate of his deceased father, Goodman Goldstein.

Subsequent to the closing, Wilson, through one of its wholly-owned subsidiaries, obtained title to Riverview by mortgage foreclosure. However, Wilson never conveyed title to the amusement park to Steamship.

After the payment of $66,213.21 of the principal amount, applied to the ABC note, the mortgages became in default for nonpayment of interest and scheduled partial payment of principal, and, on or about March 16, 1962, the mortgagees, in accordance with the terms of the mortgages, took possession of the S. S. "BAY BELLE" and the S. S. "JOHN A. MESECK" and retained possession until the United States Marshal obtained custody in accordance with process issued in the instant cases.

By agreed procedures, the vessels have been sold, the S. S. "BAY BELLE" for $45,000.00 and the S. S. "JOHN A. MESECK" for $150,000.00, and the proceeds held awaiting this decision as to their disbursement.

As of the date of hearing, December 10, 1962, accrued interest and principal on Steamship's note to Wilson amounted to $540,600.97, and on Steamship's note to ABC, $988,119.89.

Other facts as they relate to the specific issues to be decided will be stated hereafter in this opinion.

ISSUES:

At a pretrial conference, the Court adopted as the issues to be decided, the following statement agreed to by all proctors:

"The Issues in these two causes to be determined by the Court are:

"1. Is the Mortgage on each vessel a valid Preferred Ship Mortgage under Chapter 25 of Title 46, USC, as amended?

"2. Other than herein admitted in this Pretrial Order, which of the claims of the original libelants and intervening libelants against the respective vessels are Maritime Liens under § 971 of said Chapter 25 and, if so, in what amount?

"3. If the said respective mortgages are valid Preferred Ship Mortgages, what claims so found to be Maritime Liens constitute Preferred Maritime Liens under § 953 of said Chapter 25 entitled to priority in the distribution of the proceeds of sale of the respective vessels—ahead of the respective Preferred Ship Mortgages?

"4. If said respective mortgages are held invalid as Preferred Ship Mortgages, what claims held to be Maritime Liens are entitled to be paid out of the proceeds of sale of the respective vessels prior to the payment of any of such proceeds to the holders of said respective mortgages?

"5. In any instance, what is the amount found to be due the mortgagees upon the respective mortgages?

"6. What jurisdiction and authority, if any, does this Court, as a Court of Admiralty, possess and what relief (within such jurisdiction and authority), if any, should it give, in connection with the defense raised by the respective original libelants to the respective libels of foreclosure, based upon the asserted failure of Wilson Line, Inc. to deed to Wilson Steamship Corporation the property known as Riverview Beach Park?

"7. What jurisdiction and authority, if any, does this Court, as a Court of Admiralty, possess, in determining the amount due on the respective mortgages or in making any distribution to the mortgagees of the avails of said respective vessels, to require the said mortgagees to assert or resort to any other collateral, guarantys, pledges, assignments or rights, and what requirements

(within such jurisdiction and authority) should this Court interpose, if any.

"8. Did the mortgagees, when they took possession of said respective vessels as alleged in said respective libels to foreclose said respective mortgages, waive their right to foreclose said mortgages?"

To distill further the statement of what must be decided, it thus appears that the principal question is the validity of the mortgages, because if they are valid Preferred Ship Mortgages within the meaning of the Ship Mortgage Act of 1920, 46 U.S.C.A. § 911, et seq. the subsidiary questions of which, if any, of the other maritime liens are entitled to priority of the mortgages, the effect of the failure to convey Riverview Park and the extent to which the Court may and should require ABC to proceed against the life insurance policy and the interest in the Goldstein estate are then presented for decision. If the mortgages are not "Preferred Mortgages" within the meaning of the Act, the Court must then consider whether the other liens are maritime liens and the order of their priority.

I—*Validity of the Mortgages:*

■ The Ship Mortgage Act of 1920 represented legislation adopted by Congress to overcome, in regard to ship mortgages, the decision in Bogart v. The John Jay, 17 How. (58 U.S.) 399, 15 L. Ed. 95 (1854), which held that a mortgage on a ship was not a maritime contract and was not within the admiralty jurisdiction and, thus, the mortgagee could not bring suit *in admiralty*, either in personam on the debt or in rem to foreclose his security interest in the ship. The Act purports to give such mortgages a "preferred status," but, in order for a mortgage to accomplish that result, strict compliance with the Act as a matter of jurisdiction is required, Detroit Trust Co. v. The Thomas Barlum, 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176 (1934); Gilmore and Black, The Law of Admiralty (1957 Ed.), §§ 9–47, 9–52. Section 30, subsections C and D, of the Act, 46 U.S.C.A. §§ 921 and 922, sets forth the numerous requirements, including recording, which must be met in order for a mortgage to create a preferred martime lien and, insofar as pertinent, that section states:

921.

"(b) Such collector of customs shall record bills of sale, conveyances, and mortgages delivered to him, in the order of their reception, in books to be kept for that purpose and indexed to show—

"(1) The name of the vessel;

"(2) The names of the parties to the sale, conveyance, or mortgage;

"(3) The time and date of reception of the instrument;

"(4) The interest in the vessel so sold, conveyed, or mortgaged; and

"(5) The amount and date of maturity of the mortgage."

922.

"(c) There shall be indorsed upon the documents of a vessel covered by a preferred mortgage—

"(1) The names of the mortgagor and mortgagee;

"(2) The time and date the indorsement is made;

"(3) The amount and date of maturity of the mortgage; and

"(4) Any amount required to be indorsed by the provisions of subsection (e) or (f) of this section.

\* \* \* \* \* \* \*

"(e) A mortgage which includes property other than a vessel shall not be held a preferred mortgage unless the mortgage provides for the separate discharge of such property by the payment of a specified portion of the mortgage indebtedness. If a preferred mortgage so provides for the separate discharge, the amount of the portion of such payment shall be indorsed upon the documents of the vessel."

Based upon these statutory requirements, the holders of the alleged maritime liens—other than the mortgagees—claim that the mortgages are deficient in four respects. It is argued, first, that

the mortgages included property other than a vessel, and failed to provide for the separate discharge of such property by the payment of a specified portion of the mortgage indebtedness or in any other manner, as required by § 922(e), supra. Second, it is argued that the failure of Wilson to convey Riverview constituted a failure of consideration for the mortgages so that, if not totally invalid, the true amount of the mortgages was thus $1,300,000.00, instead of $1,500,000.-00, and the recording and the endorsement upon the documents of the vessel that the principal amount of the mortgages was $1,500,000.00 was not a compliance with §§ 921(b) (5) and 922(c) (3) quoted above. As a third argument, the alleged maritime lienors point to the fact that the mortgage on each vessel shows on its face that the mortgage is due on April 1, 1971, while the note to ABC which they secure is due April 17, 1971, and, hence, the endorsement upon the documents of the vessel does not correctly reflect the date of maturity of the mortgage, so that, again, there is non-compliance with §§ 921(b) (5) and 922 (c) (3). Last, these lienors assert that the mortgagees' taking possession of the vessels upon a default in the mortgages, but prior to foreclosure, exhausted or waived any of the mortgagees' other rights under the terms of the mortgage.

A—*Alleged Inclusion of Non-Maritime Property:*

In order for the first argument to be understood in its proper context, it is necessary to recite that the mortgage on each vessel states that it is in the principal amount of $1,500,000.00. Section 16 of each mortgage, entitled "Events of

Default," provides the circumstances under which either mortgagee may accelerate the maturity of the mortgage by declaring the principal indebtedness which the mortgages secure to be due and payable immediately, and to foreclose. Included in such circumstances is the failure on the part of Steamship, *inter alia:*

> " * * * to perform all of the provisions now or hereafter contained in the mortgages bearing even dates with these presents from the Owner [Steamship] to Wilson and ABC covering the vessels M. V. 'Hudson Belle,' M. V. 'Sea Belle' and S. S. 'Bay Belle' and real estate known as Tolchester Park, Wharf and Beach, within thirty (30) days after having been requested so to do by either mortgagee." [2]

The alleged maritime lienors assert, not only by reference to the amount of each mortgage and to the events of default provision quoted above, but also by reference to §§ 911(5), 921(b) (5) and 922(c) (3) of 46 U.S.C.A. and the decision of Judge Chesnut in The Emma Giles, 15 F.Supp. 502 (D.C.Md.1936), that the word "mortgage" as used in the Act means the entire transaction concerning the security for the indebtedness and includes each item and document securing the loan. From this, it is argued, the transaction here covers both maritime and non-maritime property and the failure of each mortgage to provide for the separate discharge of the vessel to which it attaches constitutes fatal non-compliance with 46 U.S.C.A. § 922(e).

The statutory references relied on in support of the argument beg the question that they are cited to answer.[3] Nor does

---

2. Mortgage on S. S. "JOHN A. MESECK," at p. 14. In the mortgage on S. S. "BAY BELLE" the language is identical, except to substitute S. S. "JOHN A. MESECK" for S. S. "BAY BELLE."

3. § 911(5):
 "The term 'mortgagee', in the case of a mortgage involving a trust deed and a bond issue thereunder, means the trustee designated in such deed."
 § 921(b) (5):
 "Such collector of customs shall record * * * mortgages delivered to him

* * * in books to be kept for that purpose and indexed to show—
 * * * * * * *
 "(5) The amount and date of maturity of the mortgage."

§ 922(c) (3):
 "There shall be indorsed upon the documents of a vessel covered by a preferred mortgage—
 * * * * * * *
 "(3) The amount and date of maturity of the mortgage * * *."

the decision in The Emma Giles, supra, support the contention.

▉ In The Emma Giles, Judge Chesnut held that, sitting as an admiralty court, he had no jurisdiction to foreclose an alleged preferred ship mortgage which, *by the terms of the single document*, purported to create a mortgage lien on three vessels, four parcels of real estate in Baltimore City and two parcels of real estate in Kent County, Maryland, but which failed to give an *unqualified* right to the mortgagor to a release of any of the mortgaged property upon payment of a certain sum, because there was non-compliance with 46 U.S.C.A. § 922(e). In reaching this result, Judge Chesnut commented that the primary purpose of the Ship Mortgage Act of 1920 was (15 F.Supp. p. 506) "to insure the validity of the Act in extending the admiralty jurisdiction to ship mortgage foreclosures, and to free the proceeding from the entangling alliance of the non-maritime property which obviously could not be foreclosed in admiralty, because entirely beyond any proper concept of such jurisdiction." And to accomplish this result (p. 506) "it was thought necessary to provide that the non-maritime property must be released or discharged from the mortgage upon payment of a specified sum, thus also apportioning or severing the mortgage debt with respect to the several properties, maritime and non-maritime." As another purpose of § 922 (c) and (e) Judge Chesnut suggested (pp. 507–508):

> "there is another consideration which emphasizes the importance of the endorsement of the release rate of the non-maritime property on the ship's documents as further notice to prospective lienors of the ship. As subsequent encumbrances on the particular vessel they may become vitally interested, through the equitable principles of subrogation or marshalling of assets, in what security the non-maritime property affords for the mortgage indebtedness in addition to the vessel on which they have the junior lien."

Briefly stated, the segregation purposes of the Act are two-fold: (1) jurisdictional and (2) to give notice to persons dealing with the ship.

It should be noted that these statements of Judge Chesnut were made in dealing with a mortgage which, by its terms and within the corners of a single document, purported to create a mortgage lien on both maritime and non-maritime property. That Judge Chesnut did not intend his statements to be applicable to mortgages, like those in the case, covering only maritime property, even though the mortgages secured a debt for which other security of non-maritime property was given by separate instruments is shown by his later decision in The Eastern Shore, 31 F.Supp. 964 (D.C. Md.1940). There the preferred status of a ship mortgage was enforced in admiralty *notwithstanding that the mortgagee had other security for its loan* (see p. 968).

Other cases, besides The Eastern Shore, have recognized the validity of a preferred ship mortgage even though it may have been created as part of a transaction in which, *by separate instrument,* the lender obtained other security on non-maritime property. In Libel of Pilgrim Trust Co. v. The Frances C. Denehy, 94 F.Supp. 807 (D.C.Me.1950), the Court adopted the report of a commissioner which rejected the argument that the validity of a preferred ship mortgage was destroyed by a pledge, in the note which the mortgage secured, of any moneys belonging to the vessel in the hands of the lender, in spite of the argument that foreclosure might be invoked on non-maritime property. In disposing of the argument, the commissioner (whose views became that of the Court) said (p. 814): "* * * it is necessary to say only that the *mortgage* in the instant case purports to cover only the vessel, although the *note* involves an additional undertaking."

Similarly, in Pascagoula Dock Station v. Merchants and Marine Bank, 271 F.2d 53 (5 Cir., 1959), separate mortgages on two ships were given to secure one debt.

It was argued that because for a single debt the Bank took simultaneous preferred ship mortgages on two vessels, and because neither provided for the separate discharge of either vessel, the mortgage sought to be foreclosed had lost its preferred status. The argument was rejected, as follows (p. 55):

"Pascagoula apparently argues backwards from the prohibition on a preferred ship mortgage covering property other than a vessel in the absence of express provision for separate release, 46 U.S.C.A. § 922(e), and the requirement that if a mortgage includes more than one vessel express provision must either be made for separate release or the admiralty court on foreclosure shall fix it on a pro rata value plus 20 per cent. 46 U.S.C.A. § 922(f). But the statute does not impliedly forbid separate and distinct preferred ship mortgages on several vessels as security for a single debt. The purpose behind Section 922(e) and (f) is to make certain that where several properties are covered in a *single* mortgage that the special statutory mortgage lien shall or may be released as to any one property on the payment of a specified or ascertainable sum. Gilmore & Black, Admiralty 580–83 (1957); see also 46 U.S.C.A. § 954(b). Where the mortgage covers but a single vessel, there is no need to apportion as between it and nonmaritime property or other vessels. In such case the documents of the particular vessel concerned will reflect that she is subject to a full preferred ship mortgage lien *to the extent of the debt, whatever it might be.*" (Latter emphasis supplied.)

The R. Lenahan, 10 F.Supp. 497 (D.C. E.D.Pa.1935), cited by the alleged maritime lienors, does not differ from this line of authority. The case held ship mortgages not to be preferred ship mortgages within the meaning of the Act, because they were not recorded in the home port of the mortgaged vessels.

The rationale of the Act as stated by Judge Chesnut in The Emma Giles and the other cases discussed all point to the validity of the mortgages here. In the foreclosure of each mortgage, the Court, as an admiralty court, is not concerned with the foreclosure of non-maritime property; hence, there is no jurisdictional defect. As to each ship, each of the alleged maritime lienors was on notice that the ship was subject to a prior lien of $1,500,000.00, so that each, if not entitled to priority greater than that afforded a preferred ship mortgagee, was in full possession of the facts from which to judge how much credit to extend to the ship and for what term. In short, the mortgagors here have done nothing more than to follow the course suggested in Gilmore and Black, The Law of Admiralty (1957 Ed.), p. 581, in regard to composite mortgages, where it is said: "The simple solution is to take separate mortgages on the maritime and non-maritime property and avoid the whole problem." The Court, therefore, holds that the mortgages do not violate 46 U.S.C.A. § 922(e) and are not invalid for that reason.

### B—*Failure of Consideration*

The argument of the alleged maritime lienors relates to Wilson's failure to convey title to Steamship of Riverview Park which, by the March 30, 1961 agreement, had an assigned value of $200,000.00. It is argued that this failure results in the reduction of the total debt to $1,300,-000.00, so that there was noncompliance with 46 U.S.C.A. § 921(b) (5) [recording of *amount* of mortgage with the collector of customs of the port of documentation of the vessel] and 46 U.S.C.A. § 922(c) (3), supra [endorsement of *amount* of mortgage on the vessel's documents], because the amount of the mortgage was stated in both places to be $1,500,000.00, with resulting non-validity of the mortgages as preferred ship mortgages.

It is clear that at the time of the March 30, 1961 agreement, and at the closing, it was well-known that Wilson did not have title to Riverview Park, but

82

that Wilson was procuring title through a mortgage foreclosure in a state court. On or about April 17, 1961, and thereafter, a deed to convey the property to Steamship and a mortgage from Steamship to Wilson and ABC were prepared and submitted to counsel for Steamship. Intertwined, however, in the actual conveyance was the insistence by Wilson and ABC that the pledge agreement to be executed by Mrs. Goldstein be signed. On and after April 17, 1961, Wilson, through its subsidiary, was ready, willing and able to convey Riverview to Steamship, but its failure to do so was occasioned, first, by Mrs. Goldstein's failure or refusal to sign the pledge agreement, and the subsequent default of Steamship under the two mortgages. There is no question of the bona fides of the parties as to the amount of the original mortgage debt, or of Wilson's efforts, willingness and ability to honor its agreement to cause title to Riverview to be conveyed to Steamship as soon as Wilson, or its subsidiary, could obtain title. As a matter of fact, as well as of law, United States v. Bethlehem Steel Company, D.C. Md.1962, 215 F.Supp. 62, Wilson was justified in refusing to convey Riverview.

Subsequent reductions of the lien amount (in this case $1,500,000.00) either by payment by the mortgagor or by his failure to complete his part of the bargain, thus justifying the mortgagee's refusal to convey additional property, should not destroy the preferred status of the mortgage because the amount is less than that stated on the ship's documents. The existence of a lesser lien amount than shown on the documents of the ship, when not the fault of the mortgagee, in no way harms subsequent lienors; if anything, it may help them if the proceeds from a sale of the property is in excess of this amount. Under these facts, it cannot be said that there was noncompliance with 46 U.S.C.A. §§ 921 (b) (5) and 922(c) (3).

C—*Discrepancy in Date of Maturity Between Note and Mortgage*

Each of the mortgages shows on its face that it is due April 1, 1971. Each mortgage secures, *pari passu*, the Wilson note in the principal amount of $500,-000.00, and the ABC note in the principal amount of $1,000,000.00. The latter note, on its face, is due April 17, 1971, and so it is claimed here that there was fatal noncompliance with 46 U.S.C.A. §§ 921(b) (5), 922(c) (3), because the date of maturity of the mortgage was not accurately disclosed.

It is not argued that the date of maturity stated in the mortgage, April 1, 1971, was not the date that was recorded and documented. Rather, it is argued that the April 17, 1971 maturity date of the ABC note controls over the maturity date of the mortgage, see 36 Am.Jur., Mortgages, § 123, at p. 748. Thus, it is argued that April 17, 1971 is the date of the maturity of the mortgage, and that this date has not been recorded.

This argument can only be indulged in where there is an irreconcilable conflict between the dates, however, where the proceeding is for the enforcement of the lien, as the instant one is, and not a suit on the note, there is no such conflict and it is the maturity date of the mortgage that controls, Elders v. Feutrel, 110 S.C. 307, 96 S.E. 541 (1918). Adopting this latter rule, it is sufficient to say that the date stated in the mortgages was the one that was recorded and documented.

Even if the date of the ABC note should be deemed to prevail over the mortgages, the effect would be to extend the maturity of the mortgages some sixteen days. Undoubtedly, the legislative purpose in enacting 46 U.S.C.A. §§ 921 (b) (5) and 922(c) (3) is to put a person dealing with the ship on notice as to the date on which the lien senior to that which he is about to permit to be created matures. The Favorite, 120 F.2d 899, 902 (2 Cir., 1941). Such a prospective lienor would be misled if the maturity of the mortgage were determined to be earlier than the date specified in the mortgage, because he might well suffer the risk of finding the vessel foreclosed from under him, and its ability to earn and pay its debts terminated, if he fails to

collect or to press for payment prior to the maturity date of the mortgage. But where, as here, at most, the maturity of the mortgage is a date later than the date specified in the mortgage, it can hardly be said that the prospective lienor has been misled to his detriment, so as to constitute the discrepancy between the date in the mortgage and the date in the note, such as to violate the provisions of the Act, because he has an additional period of grace before the senior lienor's debt matures. The contention of the alleged maritime lienors in this regard is rejected.

### D—*Remedies Under the Mortgages*

 In support of their argument that Wilson and ABC, by the terms of the mortgage, had no right to file a libel to foreclose, the alleged maritime lienors point to the provisions of Section 16 of each mortgage which gives to each mortgagee, upon the happening of an "event of default" the right to:

"(1) Declare the principal indebtedness of the Notes then unpaid, with the interest thereon, to be due and payable immediately, and upon such declaration the same with interest to date of declaration shall become and be immediately due and payable and thereafter shall bear interest at the rate of 6% per annum; or

"(2) Exercise all the rights and remedies in foreclosure and otherwise given to a mortgagee by the provisions of the Ship Mortgage Act and all acts amendatory thereof and supplemental thereto; or

"(3) Bring suit at law, in equity or in admiralty, as such mortgagee may be advised, to recover judgment for any and all amounts due under the mortgage, and collect the same out of any and all property of the Owner whether covered by this mortgage or otherwise; or

"(4) Take the vessel mortgaged hereunder, without legal process, wherever the same may be; and the Owner or other person in possession forthwith upon demand shall surrender to such mortgagee possession of the same and the mortgagee may hold, lay up, lease, charter, operate or otherwise use the same for such time and upon such terms as they may determine, accounting only for the net profits, if any, arising from such use and charging upon all receipts from such use or from the sale thereof all costs, expenses, charges, damages or losses by reason of such use; and the mortgagee shall have the right to dock said vessel for a reasonable time at any dock, pier or other premises of the Owner without charge or to dock it for a reasonable time at any other place at the cost and expense of the Owner; or

"(5) Without being responsible for loss or damage, sell the vessel at public auction free from any claim by the Owner in admiralty, in equity, at law or by statute, after first publishing notice of such sale once each week for four consecutive weeks prior to the date of sale in a daily newspaper of general circulation published in the home port of the vessel to be sold, and by mailing notice of such sale to the Owner at its address given above."

The lienors stress that these remedies are stated in the disjunctive, from which they argue that the exercise of the remedy set forth in (4) to take possession of the vessels, which was admittedly exercised by Wilson and ABC on March 16, 1962, exhausted the mortgagees' other rights and, therefore, the mortgagees could no longer exercise the right to foreclose, set forth in (2). In effect, they argue that by the use of the disjunctive

"or" the remedies were meant to be mutually exclusive.

As a matter of construction of the mortgages, the argument is without merit for two reasons. First, a fair reading of each mortgage discloses that an event of default is defined only in Section 16. While it is true that Section 16 gives the remedies set forth above, without declaring them to be cumulative or mutually exclusive, those remedies are amplified by Section 17 of each mortgage and, following the amplification, Section 17 specifically states:

> "Each and every power and remedy herein given shall be cumulative. The exercise of any power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other power or remedy. No waiver, delay or omission by any mortgagee in the exercise of any right or power or in the pursuance of any remedy accruing upon any default as above defined shall impair any such right, power or remedy or be construed to be a waiver of any such event of default or to be any acquiescence therein; nor shall the acceptance by any mortgagee of any security or of any payment of or on account of the amount due maturing after any event of default or of any payment of account of any past default be construed to be a waiver of any right to take advantage of any future event of default or of any past event of default not completely cured thereby."

It seems clear that the statement that each and every power and remedy shall be cumulative, and the exercise of one shall not be construed to be a waiver of the right to exercise another, as contained in Section 17, can have reference only to the remedies specified in Section 16, and amplified by Section 17.

Secondly, to construe the above remedies as being mutually exclusive without an express declaration to that effect, would result in an unreasonable construction. If Section 16 is to be interpreted as the lienors assert, then the declaration of acceleration here eliminated any further remedy, including the right to regain possession. Thus, all of the remedies purportedly given by the mortgage would become meaningless. The parties cannot be presumed to have intended such an absurd result.

## II—*Marshaling of Assets:*

The alleged maritime lienors press upon the Court the doctrine of marshaling of assets in two regards. First, it is urged that the Court should take formal cognizance of Wilson's failure to convey Riverview Beach Park and decree that the amount of the mortgage debt is reduced to $1,300,000.00, or, in the alternative, impress a constructive trust on Riverview, appoint a receiver to sell it, and direct that the proceeds be used to satisfy the claims of Wilson's creditors, including the mortgagees, before any application of the proceeds of sale of the vessels. Marshaling is also urged in regard to the additional security taken by ABC, namely, the life insurance policy on the life of Mr. Joseph Goldstein, the assignment of Mr. Goldstein's $\frac{2}{15}$ths interest in the intestate estate of his deceased father, and the Goldsteins' guaranty. It is argued that the Court should require ABC to foreclose these latter securities and apply the proceeds to satisfy the debt due it before proceeding against the vessels which constitute the sole potential source of payment for the alleged maritime lienors.

Both of these contentions are without merit, the first because it would constitute an unwarranted extension of admiralty jurisdiction, and the second because it would be a departure from established law relating to the equitable doctrine of marshaling.

In recent decisions, Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); Swift & Co. v. Compania Caribe, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950), the extent to which courts of admiralty have applied equita-

ble principles has been extended beyond the more limited applications typified by Hartford Accident Co. v. Sou. Pacific, 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612 (1927) and The Ada, 250 F. 194 (2 Cir., 1918) (see also cases cited in: 1 Benedict on Admiralty (1940 Ed.), § 71; and Gilmore and Black, The Law of Admiralty (1957 Ed.), §§ 1–14), but this extension of the doctrine that courts of admiralty may apply equitable principles has been extended only to matters which are subsidiary but a necessary adjunct to full maritime relief. For example, in Vaughan v. Atkinson, supra, equitable principles were applied to permit a recovery of counsel fees in a suit in admiralty for maintenance and cure, and damages for failure to pay maintenance and cure, and, in Swift & Co. v. Compania Caribe, supra, jurisdiction in admiralty to inquire into whether the transfer of a vessel was a fraudulent conveyance was sustained, where resolution of that question was necessary as a part of the determination of whether proper service in a libel in personam had been made and, hence, whether the admiralty court had obtained jurisdiction.

In the cases at bar, the lienor's contention would require the Court, not only to apply equitable principles but to apply those principles to non-maritime property, here, Riverview Beach Park. It would require the Court to impose a constructive trust on this piece of realty and, of course, administer such a trust. No cases have been cited, nor has any been found, where a trust has been imposed on non-maritime property by an admiralty court, except in perhaps a limitation of liability proceeding, see 1 Benedict on Admiralty, § 71, supra. It is concluded that this Court does not have such jurisdiction.

■■■■■ Even if it should have the necessary jurisdiction to impose a constructive trust on non-maritime property, the Court concludes that such relief should not be granted. Here the aggregate face amount of mortgage debt is $1,528,720.-86, whereas Riverview Beach Park has an assigned value of $200,000.00. Even if the mortgage debt were decreed to be decreased by that amount or Riverview sold and the proceeds applied to the mortgage debt, it seems fairly obvious that, there being no evidence or even suggestion that at distress sale Riverview would produce in excess of $200,000.00, the mortgage debt could not be decreased to the point where the alleged maritime lienors could hope for any recovery after payment of the remaining unpaid balance of the mortgage and other maritime liens entitled to greater priority from the $195,000.00 proceeds of the sales of the vessels. Thus, the question is, in fact on the record before the Court, moot.

■■■■■ The short answer to the argument to the second aspect of the marshaling argument as to the life insurance policy owned by either Mr. Goldstein or Mr. and Mrs. Goldstein, the interest in the Goldstein estate vested in Mr. Goldstein, and the Goldsteins' guaranty is that neither Mr. Goldstein nor Mrs. Goldstein is Steamship; nor has there been evidence presented which would serve as a basis for disregarding Steamship as a corporate entity. Since application of the doctrine of marshaling is confined to those instances where assets are those of a common debtor, the common debtor here being Steamship, the assets sought to be marshaled being the Goldsteins', the argument is inapplicable, United States v. Bleser, 34 F.Supp. 653 (D.C.E.D.Wis. 1940); Carter v. Tanners' Leather Co., 196 Mass. 163, 81 N.E. 902, 12 L.R.A. N.S., 965 (1907); 55 C.J.S. Marshaling Assets and Securities § 6, p. 966; 35 Am. Jur. (Marshaling Assets and Securities), § 4, p. 387.

## III—*Claims Having Greater Priority Than the Mortgages:*

■■■■■ Section 30, subsection M, of the Act, 46 U.S.C.A. § 953, in substance, provides that liens for damages arising out of tort and for wages of the crew of the vessel, subsequent to the recording and endorsement of a preferred mortgage, shall, nevertheless, be entitled to

priority over the lien of the mortgage. Two such liens—one for tort and one for wages—are alleged to exist here.

The lien for tort is claimed by the intervenor, Santel Linen Service (hereafter called "Santel"). Santel's total claim in the proceeding is $1,169.47. But, by affidavit, it has been shown that of this sum $425.80 represents the value of linens and uniforms rented by the S. S. "JOHN A. MESECK," within the period June 1, 1961 to September 15, 1961, but which have never been returned, and $743.67 represents the rental charge for linens and uniforms rented and returned. That the failure to return property, possession of which was acquired lawfully, when the owner is entitled to its return and makes demand therefor, involves a tortious conversion seems clear, Prosser on Torts (2 Ed. 1955), § 15, pp. 66, 74–75; and Santel's claim against the S. S. "JOHN A. MESECK" should be allowed in the amount of $425.80, with interest at the rate of 3% dating from September 15, 1961, the date of last supply. See also, The Henry W. Breyer, 17 F.2d 423 (D.C.Md.1927).

 The lien for wages arises out of the claim of Frank Jackson and Harry B. Warner. At the pretrial conference, it was stipulated that they were employed, from February 1, 1962 to and including March 15, 1962, as maintenance men aboard the S. S. "BAY BELLE," while the vessel was laid up at Pier 1 Pratt Street, Baltimore, Maryland, during the winter months, at wages of $1.25 per hour for an eight-hour day, seven days a week. It was further agreed that they had maritime liens. Since the decision in The Herdis, 22 F.2d 304 (D.C. Md.1927), it has been the holding of this Court that maintenance personnel aboard a vessel docked in navigable waters, but not actually in navigation, are entitled to priority over the lien of a preferred ship mortgage, so that these claims, in the aggregate amount of $860.00, with interest at the rate of 3% from March 15, 1962, will be allowed in regard to the S. S. "BAY BELLE" ahead of the mortgage.

 Claimants Jackson and Warner also claim penalty wages, in accordance with the provisions of 46 U.S.C.A. § 596, because of the failure of the master or owner of the S. S. "BAY BELLE" to make payment to them within two days after the termination of their period of employment. Other than a prayer for general relief, this claim was not made in their intervening libel, but is made in a brief filed in their behalf.

This claim is disallowed. The termination of their employment coincides with the date on which the mortgagees Wilson and ABC took possession of the vessels because of a default under the mortgages, and the conclusion seems inescapable that the reason they were not paid at that time was the financial inability of the master or owner to make payment. That this is a good defense to penalty wages is clearly established, Collie v. Fergusson, 281 U.S. 52, 50 S.Ct. 189, 74 L.Ed. 696 (1930); Todd Shipyards Corp. v. City of Athens, 83 F.Supp. 67 (D.C.Md.1949); The Herbert L. Rawding, 55 F.Supp. 156 (D.C. S.C.1944); The Eastern Shore, supra.

For the reasons set forth above, the Court concludes that the mortgages are preferred ship mortgages within the meaning of the Ship Mortgage Act of 1920, but that there will be allowed as a preferred maritime lien against the S. S. "JOHN A. MESECK" the claim of Santel, in the amount of $425.80, with interest at the rate of 3% from September 15, 1961, and against the S. S. "BAY BELLE" the claims of Frank Jackson and Harry B. Warner, each for $430.00, with interest at 3% from March 15, 1962, such liens to be paid from the proceeds after the payment of court costs, the balance thereof to be distributed to the mortgagees, Wilson and ABC.

The proctors may agree upon, and present, a form of order.