**R. C. CRAIG LIMITED, Plaintiff,**

v.

**SHIPS OF the SEA INCORPORATED, Defendant.**

Civ. A. No. 2850.

United States District Court,
S. D. Georgia,
Savannah Division.

July 12, 1972.

port and opposition. The record includes a transcript of a preliminary hearing in the Municipal Court of Savannah involving a criminal trespass charge against Ronald Craig in 1971 for refusing to leave the "Cruz del Sur" when directed. Briefs have been filed and oral argument heard.

A reading of the record and the briefs leaves me with a distinct impression that this is not a proper case for summary disposition. Such is particularly true in a Circuit where the mortality rate of summary judgments on appeal is so high. "Summary judgment is a lethal weapon, and courts must be mindful of its aims and targets and beware of overkill in its use." Brunswick Corporation v. Vineberg, 370 F.2d 605, 612 (5 Cir.). The short-cutting of trials often proves "the longest way around is the shortest way through." Gray Tool Co. v. Humble Oil & Refining Co., 186 F.2d 365 (5 Cir.). To warrant summary disposition there must be no genuine issue of fact and the moving party must be entitled to judgment as a matter of law. The burden of clearly showing this is on movant. The slightest doubt as to the facts requires denial of the motion. See St. John v. New Amsterdam Casualty Company, 357 F.2d 327 (5 Cir.); Liberty Leasing Co., Inc. v. Hillsum Sales Corporation, 380 F.2d 1013 (5 Cir.); Gauck v. Meleski, 346 F.2d 433 (5 Cir.); Scott v. Great Atlantic & Pacific Tea Company, 338 F.2d 661 (5 Cir.); National Screen Service Corporation v. The Poster Exchange, Inc., 305 F.2d 647 (5 Cir.).

Defendant insists that there is no genuine factual issue concerning plaintiff's breach of the agreement to purchase the "Cruz del Sur." The interpretation of contracts ordinarily raises an issue of law and such cases are generally a proper subject for summary judgment. United States v. Manufacturers Casualty Insurance Company, 158

Barnard M. Portman, Smith & Portman, Savannah, Ga., for plaintiff.

Edward T. Brennan, M. Lane Morrison, Adams, Adams, Brennan & Gardner, Savannah, Ga., for defendant.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

LAWRENCE, Chief Judge.

In this diversity action R. C. Craig Limited, a Canadian corporation, seeks specific performance and damages from the defendant as the result of an alleged breach of an agreement dated July 30, 1971, to sell the barkentine "Cruz del Sur." The complaint was brought jointly by the alien corporation and Ronald C. Craig, its apparent organizer, against Ships of the Sea, Incorporated and Mills B. Lane, Jr. as an individual and as trustee. The action by the individual plaintiff and that against the individual defendant was dismissed, neither being a formal party to the contract of sale.[1]

Ships of the Sea has moved for summary judgment. Both sides have presented affidavits and exhibits in sup-

1. An agent is not liable for his principal's contract where the agency is disclosed and an agent has no right to sue on a contract made by him for the principal.

Fields v. Goldstein, 97 Ga.App. 286, 102 S.E.2d 921; Scoggins v. Hill, 90 Ga. App. 283, 82 S.E.2d 739; Ga.Code Ann. § 4–404.

F.Supp. 319. The instant case is not as simple as that. In fact, it is quite complicated and there are disputes as to the facts in several areas.

The alleged breach by Craig relates to its failure to furnish a preferred ship's mortgage and hull and protection and indemnity insurance at the time of closing. Such a mortgage was of great importance to the seller which agreed to deliver the "Cruz del Sur" without any partial payment. The purchase price was $250,000 payable in quarterly installments beginning six months after the date of sale. The agreement of July 30, 1971, provided that the 5% note was to be secured by a First Preferred Ship Mortgage as defined in the United States Ship Mortgage Act. The existence of hull insurance and protection and indemnity coverage was equally important to seller. Neither was tendered by the buyer. As an undocumented foreign-built vessel the "Cruz del Sur" could not be so mortgaged. As an alien corporation, Craig could not grant a preferred mortgage on her even if she had been properly registered or enrolled in the United States.

 To be eligible for a preferred mortgage the ship must be a "vessel of the United States." 46 U.S.C.A. §§ 921, 922. Only vessels registered pursuant to law are "vessels of the United States." 46 U.S.C.A. § 221. Foreign-built vessels can be owned by citizens of the United States. However, they are not entitled to registry, enrollment and license as American vessels since they were not built in this country. The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937. No preferred mortgage can be recorded unless the vessel covered was documented as a vessel of the United States at the time the mortgage was made. 46 C. F.R. § 67.47–7. "Documented" means "registered, enrolled and licensed . . . by the U.S. Coast Guard." 19 C.F.R. § 4(b), (c).

 Generally, registry applies to vessels in foreign commerce; enrollment to coastwise navigation. They involve similar qualifications and requirements. Registry endows a ship with a national character and affords the protection of such nationality. Registry and enrollment are similar in character but differ in that they apply under different statutes to vessels engaged in distinct pursuits. See 48 Am.Jur. Shipping §§ 46, 47, 53, 218; 80 C.J.S. Shipping § 3, pp. 574–578. See also Gilmore and Black, The Law of Admiralty (1957), p. 574f.

 Since the "Cruz del Sur" was built in Spain she could not be registered or enrolled in the United States even though owned by a citizen of this country. Unless so documented the vessel is not the subject of a preferred ship's mortgage. "A preferred mortgage may not be placed upon any vessel which is not a documented vessel. . . ." 46 C.F.R. § 67.49–1(b).[2]

 Without a preferred mortgage the seller of a ship has unsatisfactory security for the purchase price. The Ship Mortgage Act of 1920 accords preferred status to security instruments that comply with its terms. The lien thereof is superior to all except preferred maritime liens, such as seamen's wages. 46 U.S.C.A. § 953. A common-law mortgage on a vessel confers no right of access to the admiralty courts of the United States. Such an instrument does not constitute a maritime contract. Commercial Banking Corporation v. One Approximately 30-Foot Motor Boat et al., 86 F.Supp. 618; North American Continental Co. v. The El Cuis, 107 F. Supp. 436; Port Welcome Cruises, Inc. v. S. S. Bay Belle, 215 F. Supp. 72, aff'd. 324 F.2d 954 (4 Cir.). The only mortgage on a ship which may invoke the admiralty jurisdiction for its foreclosure is one executed in accordance with the Ship Mortgage Act. Hirsch v. The San Pablo, 81 F.Supp. 292.

2. I will later discuss the documentation of foreign-built "yachts" over twenty tons which are owned by citizens of the United States and used for pleasure.

The "Cruz del Sur" was not registered or enrolled in the United States and carried no ship's papers except a Georgia Motorboat license. See Ga. Code Ann. § 17–605. Her papers had been left in possession of the authorities at Nassau where she had been registered as a British vessel by a previous owner. The certificate of registration in the Bahamas which Twentieth Century Fox had obtained from the Registrar of Shipping was cancelled in 1967 and the registry of the vessel closed because of her sale to an American citizen.

Seller says the buyer breached its contract to purchase the vessel by not furnishing a preferred ship's mortgage as it was required to do. Buyer replies that such was impossible since the vessel was not registered in the United States, and that, as long as she was not, a preferred ship's mortgage could not be granted or recorded. Seller says that as a foreign corporation Craig was ineligible to purchase an American-owned vessel without approval of the Maritime Administration and would not grant a United States preferred mortgage.

A look at the background of the matter in controversy may be helpful to a better understanding of the legal questions. The "Cruz del Sur" was built at Valencia, Spain in 1947. She was a three-masted barkentine with an auxiliary diesel engine. Her burden was about 150 tons and she had an overall length of around 158 feet. She appears to have been used for a time as a Spanish training ship. Later she was acquired by Twentieth Century Fox Productions, Limited, a British corporation.[3]

Mills B. Lane, Jr. had created a maritime museum on the riverfront at Savannah which houses a superb collection of model ships. It is owned and operated by Ships of the Sea, Inc., a non-profit organization of which he is a trustee. He became interested in the "Cruz del Sur" and in 1965 Lane Enterprises purchased the vessel from Twentieth Century Fox. She was brought to Savannah and tied up near the Ships of the Sea Museum. Subsequently, there were extensive repairs and refitting of the vessel, including considerable work on the hull and interior. New masts and new engines were installed.[4] In 1968 the vessel was transferred to Ships of the Sea as a gift from Lane Enterprises.

Except for short trips in the Savannah River the only time the "Cruz del Sur" put to sea, at least until this year, was on July 30, 1971, when Mr. Craig and a small group, without Lane's permission, took her ten miles beyond Tybee and anchored overnight near the Savannah light tower. On the same day the Canadian corporation had signed the contract to purchase the vessel. Craig claimed that the "trial run" was authorized by a provision in the sales agreement which permitted inspecting and testing pending closing. Apparently Mr. Craig regarded himself as the owner. Lane entertained decidedly different notions about taking a convivial cruise on his uninsured vessel. A criminal warrant was sworn out[5] and a restraining order obtained in the Superior Court enjoining Craig from going aboard. Plaintiff contends that these activities constituted an anticipatory repudiation of the contract which relieved the buyer from further obligations prior to litigation. See Ga.Code Ann. § 109A–2–609. I disagree.

The "Cruz del Sur" proved a picturesque addition to the waterfront. She was also expensive. The average monthly cost of maintenance during 1968–1971 was $3,462.57. In September, 1970, Mr. Lane wrote that he wanted to dispose of the vessel "just as fast as I can because the old girl is going to pot as she is." During the same month a representative was sent to the Bahamas "to bring the ship's papers, Registry, etc. up to date."

---

3. I have read somewhere that she was used in the motion picture version of Richard Hughes' *High Wind Over Jamaica.*

4. This is outside the record.

5. Craig was subsequently acquitted.

He twice visited the Registrar of Shipping at Nassau but was unable to accomplish his apparent mission of securing transfer of the original registration or re-registering her in the name of Ships of the Sea. The Bahamian authorities refused and retained the ship's papers. Tr. pp. 29–30.

Ronald C. Craig is a Canadian citizen although he apparently resided or resides in the State of Washington. He came to Savannah shortly before July 4, 1971. Mr. Lane was entertaining some guests aboard the "Cruz del Sur." Craig, who was interested in acquiring the ship, came aboard and introduced himself. A day or so later there was an interview between the two at the Bank. Mr. Craig talked of the promotion and use of a ship he had previously owned. He planned to spend $100,000 to make the "Cruz del Sur" seaworthy (which it was not) and to bring in a crew to take her down the east coast, charging admissions while the work aboard was being done. Craig testified: "In the past few years I have been involved in the building of a 138 foot 18th century sailing bark and the promotional and public relations portion more than the actual sailing down the coast of the United States where we participated as the featured ship in various bi-centenaries through the South Seas where we became Captain Cook's Endeavor . . . The Cruz del Sur came to mind because we were trying to organize four or five ships for the American bi-centenary which takes place in '76; so we are scouring the world for other ships." Tr. pp. 37–38.

Lane was favorably impressed with Craig and his plans and ideas. Negotiations were undertaken. There was initial discussion of a joint venture which, for tax reasons, was not practical as far as Ships of the Sea, Inc. was concerned. Meanwhile, Craig and his wife were invited to stay aboard the vessel. Tr. pp. 4–5.

The agreement for the sale of the "Cruz del Sur" was prepared by Lane's counsel. Craig eschewed legal representation. That was his privilege but his failure to retain a lawyer places him in no better position as to legal rights. Defendant was aware of the documentation problems. So was Mr. Craig. Mr. Lane testified that he "knew I had no documents." Tr. p. 30. Craig stated at the hearing that he had "been through this with the Coast Guard up and down the West Coast of the United States and a foreign vessel cannot be registered in the United States in any way, shape, or form at all." Tr. pp. 55–56. In an affidavit furnished in opposition to the motion he seems to have swallowed these words. In it he claimed that he was "never informed of any complications in connection with the transfer of this vessel insofar as his not being able to register the vessel in the United States and because of insufficient record of title being furnished to him by the sellers and his therefore being unable to give a preferred ship's mortgage as said ship's mortgages can only be given on vessels registered in the United States." [6]

▮▮▮▮ A foreign-built yacht purchased by a citizen of the United States may be documented by meeting certain requirements. See 46 C.F.R. §§ 67.67–1; 67.01–5(i). Whether foreign-built or not, any yacht over 20 net tons may be enrolled as a yacht "if used exclusively as a pleasure vessel." 46 C.F.R. § 67.-01–3(b). Such a yacht purchased by a citizen of this country may be documented. The owner can obtain a "consolidated certificate of enrollment and yacht license." 46 C.F.R. §§ 67.67–1; 67.63. When thus documented, the boat would be the subject of a valid, recordable preferred mortgage. 46 C.F.R. § 67.49–1(b). The record in this case is silent as to what efforts Mr. Lane or Ships of the Sea made to document the "Cruz del Sur" in this country other than obtaining the Georgia Motorboat license.

---

6. An affidavit furnished by defendant's counsel states that Mr. Craig had the Georgia Motorboat Certificate in his possession.

One of the seller's chief contentions is that the buyer could not perform its part of the contract since it was an alien corporation. Without the approval of the Maritime Administration, it is unlawful to sell a vessel documented under the laws of the United States to any person who is not a citizen of this country. 46 U.S.C.A. § 808; 46 C.F.R. § 67.57–1; United States v. The Tanker Lake George, 123 F.Supp. 216. Further, if such a sale is consummated, the ship becomes a foreign vessel and the American documentation would have to be surrendered. 46 C.F.R. § 67.57–3.

If Lane or Ships of the Sea had documented the vessel as a pleasure yacht so as to make her eligible for a preferred ship's mortgage, she would become undocumented the moment the bill of sale was delivered to an alien and any mortgage delivered by Craig to the seller could not be a preferred one. From the inception of the contract anything close thereafter was pure futility.

The power of Congress to enact the Preferred Ship Mortgage Act of 1920 is based on its right, under the grant of admiralty jurisdiction, to alter and amend the maritime law. The Oconee, 280 F. 927. In connection with the constitutional issue see also Gilmore and Black, The Law of Admiralty (1957), p. 571f. The present case is a diversity case and not one of admiralty jurisdiction. An agreement to sell a ship is not a maritime contract and is not cognizable in a court of admiralty. The Ada, 250 F. 194; Grand Banks Fishing Co. v. Styron, 114 F.Supp. 1; The Guayaquil, 29 F.Supp. 578; Flota Maritima Browning de Cuba, Sociadad Anonima v. Snobl, 363 F.2d 733 (4 Cir.). The applicable substantive law appears to be the Commercial Code of Georgia. Under the Uniform Code (Sales) it has been held that ships are "goods." Silver v. Sloop Silver Cloud, 259 F.Supp. 187; Fireman's Fund American Insurance Company v. Boston Harbor Marina, Inc., 406 F.2d 917 (1 Cir.).

Plaintiff cites Ga. Code Ann. § 109A–2–614(2) which provides that if payment fails because of a domestic or foreign governmental regulation, the seller may withhold delivery unless the buyer provides a manner of payment which is "commercially a substantial equivalent." Counsel argues that the "substantial equivalent" here was registration or recordation in the Fiji Islands which is a British possession. The sales agreement provides that the Preferred Mortgage was to be recorded by Craig's corporation which was to furnish confirmation thereof by "the United States Coast Guard (or the Fifi Islands Coast Guard)." Plaintiff contends that under the Ship Mortgage Act a foreign ship mortgage on a documented foreign vessel executed in accordance with the laws of such country is includible in the term "preferred mortgage." 46 U.S.C.A. § 951. Counsel for Craig has furnished an affidavit to the effect that he ascertained that a British-registered ship can transfer a valid registration at Suva and be mortgaged there under an instrument having the same force and effect as a United States Preferred Ship's Mortgage. The background of the somewhat vague reference in the sales contract to the Fijis has not been developed. From the existing record I conclude that such a registration procedure was contemplated neither by the seller nor the agreement. The sales contract stated that the "Cruz del Sur" was not to be registered under a foreign flag. What Ships of the Sea bargained for was a United States Preferred Ship's Mortgage, not a supposed British equivalent.

At the "closing" on August 4, 1971, the buyer tendered a promissory note and an executed form of preferred ship's mortgage. Counsel for seller declined to accept same on three gounds: (a) "you can't tender a preferred ship mortgage on an undocumented vessel"; (b) it would be impossible for an alien to obtain documentation of an American flag vessel, and (c) because the required in-

surance had not been furnished.[7] After Craig's tender of an executed preferred mortgage defendant's attorney took same to the Coast Guard Documentation Officer who informed him that it could not be recorded since the mortgagor was an alien and the "Cruz del Sur" was an undocumented vessel.

Plaintiff contends that Ships of the Sea breached its contract to sell by failing to deliver a vessel documented in such manner as to make it eligible for the preferred mortgage. This may be an implied undertaking by the seller. Under the Commercial Code he warrants that the title shall be "good, and its transfer rightful."[8] The standard treatises on the Commercial Code as well as textbooks and digests on Sales do not deal with the question. In selling a vessel I should think that it is the duty of the seller to deliver all transferable documentation.[9]

It may be that there was an implied condition that the seller document the vessel in order that the buyer could perform his part of the bargain. Ships of the Sea argues that even if there was an implied condition that it obtain United States documentation before the closing the buyer still would have been unable to perform because of its alienage. In seeking specific performance plaintiff prays to be excused from non-performance of the preferred mortgage provision and asks that that requirement be "removed" from the contract because of its impossibility. This would be a judicial rewriting of the agreement which I do not think courts should undertake.[10]

Impossibility of performance is a branch of contract law which has more than its share of refinements, distinctions and exceptions.[11] Under the Uniform Commercial Code, nondelivery by the seller is not a breach of his duty under a contract of sale if the agreed performance "has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made." Ga. Code Ann. § 109A–2–615(a). This rule appears to be inapplicable to the facts of the present case.

Under general Georgia law, "Impossible, immoral and illegal conditions are void, and are binding upon no one." Ga. Code Ann. § 20–111. A similar principle is embodied in the Uniform Commercial Code. The courts may disregard the contract or any clause which is "unconscionable at the time it was made." In such cases the remainder of the contract can be enforced. Unconscionability is a question of law for the court to decide in the light of the background and commercial setting of the contractual provision. The parties are entitled to an evidentiary hearing on

---

7. Craig's position is that the contract required the seller to insure the vessel if buyer did not. The agreement states that if the latter failed to comply with the insurance requirements, seller could insure the vessel, if it desired, at buyer's cost and expense. See paragraph 2(e). It was not the duty of the seller to provide insurance. The contract is silent as to the time same was to be furnished but it is inferable that coverage was contemplated immediately upon delivery of the note and preferred mortgage. As far as I can make out plaintiff made no effort to obtain the insurance required by the sales agreement.

8. According to the Official Comment, the buyer is to get "a good, clean title transferred to him also in a rightful manner

so that he will not be exposed to a law suit in order to protect it."

9. The contract of sale provided that immediately after the closing Craig would obtain "new documents" for the "Cruz del Sur."

10. See in this connection, 6 Williston, Contracts § 1931, p. 5409f.

11. E. g., objective versus subjective impossibility; existing versus supervening impossibility; natural impossibility as contrasted with impossibility in fact, and strict impossibility versus extreme and unreasonable difficulty and expense. See 6 Williston, Contracts §§ 1931–1979 (rev. ed. 1938); 6 Corbin, Contracts §§ 1320–1372 (rev. ed. 1962); Restatement, Contracts § 454; 84 A.L.R.2d 12–115; 17 Am.Jur.2d Contracts §§ 403–440.

that issue. Ga. Code Ann. § 109A–2–302(1), (2).

■ According to the Official Comment, "unconscionable" means "one-sided contracts." 1 Anderson's Uniform Commercial Code §§ 2–302:3 through 2–302:7. I should think it would be difficult for a court to find "oppression" in requiring a United States Preferred Ship Mortgage as security for a purchase price on which no down payment was to be made by a foreign buyer.

■■ In this State, if an act of God makes performance impossible, it constitutes a defense "equivalent to performance." Ga. Code § 20–1102. However, I do not think that impossibility amounts to performance save where it is set up as a defense. The decision of the United States Supreme Court in *Smoot's Case* is an old one but it lays down what I conceive to be a sound rule. The Court said that impossibility of performance may be a defense to an action but that it "does not stand for performance so as to enable such party to sue and recover as if he had performed." See 15 Wallace 36, 21 L.Ed. 107; 17 Am. Jur.2d Contracts, § 404, p. 853. Because it is legally impossible for an alien to grant a United States Preferred Ship Mortgage does not constitute performance of such obligation by one who so contracted.

■■ As a general rule, a contractual duty is excused when government regulations make performance impossible. 17 Am.Jur.2d § 419; 84 A.L.R.2d 45–47; 6 Williston, Contracts §§ 1938, 1939. However, all of the cases cited seem to involve acts or orders of public authorities *subsequent* to the making of the contract. Here the seller knew at the time of the contract of sale was executed (and it was not assignable) that it could not be performed by the buyer. The latter either knew as much or is presumed to have had knowledge of the law in that respect. Where impossibility of performance is known to both parties at the time of contracting it has been held that legal consideration is lacking and that the contract is a nullity. 17A C.J.S. Contracts § 463, p. 607; 17 Am.Jur.2d Contracts § 404, n.13; 84 A.L.R.2d 32. This rule may apply here. However, I do not resolve that question now.

■ I remarked earlier that there are areas of factual controversy which preclude the grant of summary judgment. I may be wrong in that respect. It is possible that the dominant, salient and inescapable facts of the case require summary disposition. In any event, a prior denial of summary judgment does not rule out the possibility of a subsequent directed verdict following trial on the merits. Gross v. Southern Railway Company, 446 F.2d 1057 (5 Cir.). Even should there be no genuine and material issues of fact, appraisal and resolution of the legal question will be more reliable if the evidence is viewed in the round after trial rather than merely in relief on the motion for summary judgment.

There has not been a demand for a jury. The bench trial can be considerably shortened if the present record is merely fleshed out in its lean places rather than starting all over.

It is unnecessary at this point to consider whether the "Cruz del Sur" is "unique" so as to warrant a decree for specific performance. See Ga. Code Ann. § 109A–2–716. After this litigation was commenced she was sold to another party and departed Savannah. Lately the ill-starred vessel returned to this port and apparently is once more in the hands of Ships of the Sea. A libel has been filed by the crew for unpaid wages. See Zoly et al. v. The Cruz del Sur, Charles E. Gallagher and The Oceanics (Savannah Division, No. 2981).

Subject to the above comments, the defendant's motion for summary judgment is denied.