**R. C. CRAIG LIMITED, Plaintiff,**

v.

**SHIPS OF THE SEA INCORPORATED, Defendant.**

Civ. A. No. 2850.

United States District Court,
S. D. Georgia,
Savannah Division.

Sept. 23, 1975.

Barnard M. Portman, Smith & Portman, Savannah, Ga., for plaintiff.

Edward T. Brennan, M. Lane Morrison, Adams, Adams, Brennan & Gardner, Savannah, Ga., for defendant.

## OPINION AND ORDER

LAWRENCE, Chief Judge.

### I

### *The Litigation*

In this diversity action plaintiff seeks specific performance and damages as a result of defendant's alleged breach in 1971 of a contract to sell the sailing vessel "Cruz del Sur".

R. C. Craig Limited is a Canadian corporation. Its president and principal stockholder, Ronald C. Craig who is a citizen of Canada, was originally named as a plaintiff, along with the corporation, but was subsequently dismissed as a party.

Denying any breach on its part, Ships of the Sea, Inc., a Georgia corporation, says that its refusal to go through with the agreed sale of its 138-foot barkentine was due to the failure of Craig to perform material conditions of the contract of sale. Defendant contends that the buyer breached the agreement to sell by its failure (1) to tender at the closing a recordable and valid United States preferred ship mortgage and (2) by failing to furnish the insurance on the vessel required by the contract.

On July 12, 1972, this Court denied defendant's motion for summary judgment. See *R. C. Craig Limited v. Ships of Sea Incorporated*, 345 F.Supp. 1066 (S.D., Ga.). I stated that the trial might be "considerably shortened if the present record is merely fleshed out in its lean places rather than starting out all over." See 345 F.Supp. 1075.

Despite proddings by the Court, this case has slumbered on the docket for more than three years. Contributing to the delay were the extended absence of a witness on account of illness and requests for postponement because of the pendency of a state court action for malicious prosecution filed by Ronald C. Craig against Mills B. Lane, Jr. who is a Trustee of Ships of the Sea Museum. The tort case grew out of the sale of the "Cruz del Sur" but does not affect this suit. The action was finally tried in the State Court of Chatham County in June, 1975.

Meanwhile, time has mooted the specific performance feature. Ships of Sea sold the "Cruz del Sur" to another party. She was later purchased by R. C. Craig who is the present owner of the vessel. The specific performance issue has therefore disappeared.[1] Craig's claim for damages as a result of the alleged breach of contract by defendant remains to be decided.

### II

### *Evidence at the Trial*

The case was tried without a jury on August 4, 1975. Testimony was heard from Ronald C. Craig and M. Lane Morrison. The latter is the attorney for

---

1. The "Cruz del Sur" herself has disappeared. The once proud square-rigger recently settled to the bottom of a muddy slip in the Savannah River—a sad end for a barkentine which in her better days had thrilled to the embrace of the lusty winds that bellied her sails as she coursed the waters of the storied Spanish Main.

Ships of the Sea Museum. These witnesses testified at length concerning the negotiations and the background of the contract. Craig claimed that as a result of the defendant's breach of the contract of sale damages were sustained in the form of travel expenses to Savannah, attorney's fees, survey of the ship, and reasonable wages for his wife and himself during the period they stayed at Savannah prior to the time for closing the sale. He estimated that over $100,000 could have been earned by charging admission at $2.00 per head to visit the sailing vessel which was "unique", according to Mr. Craig. He testified that the total loss of profit, after expenses, would have been between $150,000 and $200,000.

Mills B. Lane, Jr. was out of the State at the time the case was tried in this Court. Plaintiff's counsel insisted on the right to cross-examine him and the trial was recessed until September 5th for that purpose. Counsel for both sides appeared on that date but Mr. Lane was unable to be present on account of illness. In response to an inquiry from the Court, Craig's attorney stated that the cross-examination of Mr. Lane would relate mainly to the negotiations as to documentation of the vessel in the Fiji Islands under British registry. The contract of sale states that immediately after the closing and prior to delivery of the ship, buyer was to obtain "new documents" for the vessel and "provide for the United States Coast Guard (or the Fiji Islands Coast Guard) to confirm to SOS that Mortgage has been recorded . . . thereupon SOS will deliver the Ship to Craig at Savannah, Georgia". Plaintiff says that this is ambiguous and does not express the true intent of the parties. Counsel for Craig contends that parol evidence is therefore admissible to prove the real agreement and un-

derstanding as to documentation of the vessel and recordation of a ship mortgage.

I suggested that when Mr. Lane was able to do so he furnish an affidavit dealing with the Fiji Islands phase and that the Court might then consider where to go in respect to cross-examination.

Mr. Lane has furnished an affidavit. In it he says that

"at no time prior to execution of the Sales Contract did he discuss the possibility of having the vessel 'Cruz del Sur' registered in the Fiji Islands while it was under mortgage to Ships of The Sea, Inc., with the attorneys for Ships of The Sea or with Mr. Craig. Deponent learned only after the execution of the Contract that, at Mr. Craig's suggestion, the language relating to the Fiji Islands Coast Guard was inserted into paragraph 7 of the Sales Contract."

Presumably Mr. Lane would testify the same way that he deposed in the affidavit. I do not think he should be subjected to cross-examination at this time and am unwilling to delay disposition of this case further. Plaintiff has had ample opportunity to take Lane's testimony for discovery purposes during the four years since the commencement of the present litigation. He testified at length in the Municipal Court hearing and the transcript has been filed in this Court. I shall decide the case on the record as it now stands.

III

*The Contract of Sale*

The contract of sale was entered into between Ships of the Sea, Inc. and R. C. Craig Limited on July 31, 1971. Ronald C. Craig who is a Canadian citizen is a resident alien in the United States.[2] He

---

2. Mr. Craig has had considerable experience with sailing vessels of other days. In 1970 he participated in the bicentennial of Captain Cook's voyage to Australia in the "Endeavour" which was reenacted by the "Endeavour II", later lost off New Zealand. Mr. Craig arrived in Savannah early in July, 1971, after learning that the vessel was ad-

is president of the corporation and its principal stockholder, as noted previously.

Under the contract, Ships of the Sea agreed to sell the sailing vessel and Craig to purchase same for $250,000. There was to be no down payment. The unpaid purchase price was to bear interest at the rate of five percent per annum and was payable in quarterly installments of $6,250 each, beginning with a first installment of $12,500 due six months after the date of sale. The note was to be secured by a first preferred ship mortgage as defined in the United States Ship Mortgage Act. The buyer agreed to post a notice in the wheelhouse to the effect that the vessel was mortgaged to Ships of the Sea, Inc. under the authority of that law. Purchaser was not to register the ship under a foreign flag without the consent of the seller or make any change in her registry that would impair its rights under the preferred mortgage.

Buyer agreed to obtain and maintain hull insurance in an amount not less than 110% of the unpaid balance of the note with the seller as loss payee. The purchaser was also required to carry protection and indemnity insurance with limits of $500,000.

Seller's attorney testified that Mr. Craig wanted to close the sale "as soon as possible" and the date of August 4, 1971, was agreed upon and inserted in the contract. At the closing, the purchaser was to deliver the note, the preferred mortgage and the personal guarantee of the indebtedness by Mr. Craig. Seller was to deliver a bill of sale. Immediately after the closing and prior to delivery, the purchaser was to obtain new documents on the vessel. As already noted, delivery of the ship was to be made at Savannah upon Craig furnishing confirmation from the United States Coast Guard or Fiji Islands Coast Guard of the recordation of the preferred ship mortgage.

## IV

### The Closing

When the time for consummating the sale arrived, the friendly relationship between Lane and Craig had disappeared. During the negotiations, the latter had been given the keys to the vessel and Mrs. Craig moved into the main cabin. Craig regarded himself to all intent and purposes as the owner. He was in "total command" of the ship, he testified in this Court. "It was mine and that was it," Craig said at the Municipal Court hearing. He testified that he had already sent for a crew to man the vessel.

During the weekend before the closing Mr. Craig took the "Cruz del Sur" to sea overnight. A "drinking party", Lane characterized it; an authorized "trial run", claimed Craig. No hull insurance was carried on the vessel and Mr. Lane was much upset. A warrant charging Craig with trespass was sworn out in the Municipal Court of Savannah and a restraining order obtained against his going aboard the "Cruz del Sur".

At the closing on August 4, 1971, the buyer tendered to the seller an executed form of preferred ship mortgage and a note for the purchase price. Counsel for Ships of the Sea informed Craig that his client declined to accept same on three grounds:

(1) "You can't tender a preferred ship mortgage on an undocumented vessel"; (2) It would be impossible for an alien to obtain documentation of an American flag vessel; (3) Because the required hull and P & I insurance was not furnished.

The United States Coast Guard subsequently refused to record the mortgage because the mortgagor was an alien and

---

vertised for sale. "The Cruz del Sur came to mind," he said, "because we were trying to organize four or five ships for the American bi-centenary in '76," See transcript of Municipal Court hearing, 37–38.

the "Cruz del Sur" was not documented under the laws of the United States. The instrument tendered by buyer would have had the status of a common law mortgage and the holder would be unable to enforce rights thereunder in the courts of admiralty. See 345 F.Supp. at 1070.

On August 20, 1971, R. C. Craig Limited filed the present action seeking specific performance and damages. It is alleged that plaintiff offered to comply with all the provisions of the sales agreement "which are legal and possible to perform and further offered to perform acts which might be necessary to secure the Defendant in this matter even though the exact letter of the agreement is not feasible to be complied with."

## V

*Right of Alien Shipowner to Document a Vessel of the United States and to Record a Preferred Ship Mortgage*

The sales contract required a United States preferred ship mortgage as defined in the Act of 1920. It accords preferred status to security instruments that comply with its terms and conditions. As this Court stated in its 1972 Order:

"The lien thereof is superior to all except preferred maritime liens, such as seaman's wages. 46 U.S.C.A. § 953. A common-law mortgage on a vessel confers no right of cases to the admiralty courts of the United States. Such an instrument does not constitute a maritime contract. *Commercial Banking Corporation v. One Approximately 30-Foot Motor Boat et al.,* D. C., 86 F.Supp. 618; *North American Continental Co. v. The El Cuis,* D.C., 107 F.Supp. 436; *Port Welcome Cruises, Inc. v. S. S. Bay Belle,* D.C., 215 F.Supp. 72, aff'd. 324 F.2d 954 (4 Cir.). The only mortgage on a ship which may invoke the admiralty juris-

diction for its foreclosure is one executed in accordance with the Ship Mortgage Act. *Hirsch v. The San Pablo,* D.C., 81 F.Supp. 292."

▪ The "Cruz del Sur" was built in Spain. In my decision on the defendant's motion for summary judgment it was stated that foreign-built vessels are not entitled to registry, enrollment and license as American vessels since they are not built in the United States. See 345 F.Supp. 1070. This was not only dictum; it was erroneous.[3] A foreign-built vessel can be documented in the United States although it may not engage in the coastwise trade. It is a more complicated process than documentation of an American-built vessel but it is permissible. See 46 U.S.C. § 11; 46 C.F.R. § 67.01–5(i).

▪ Only vessels that are wholly owned by citizens of the United States can be "registered". 46 U.S.C. § 11. The same qualifications apply to "enrollment" of such vessels. 46 U.S.C. § 252. Generally speaking, the terms "registered" and "enrolled" are used to distinguish the certificates granted to two classes of vessels. Registry is for the purpose of declaring the nationality of a vessel engaged in foreign trade; enrollment evidences the national character of a vessel engaged in the coasting trade or home traffic. See *The Mohawk,* 70 U.S. 566, 18 L.Ed. 67.

The Coast Guard Regulations provide that the "documentation" of vessels of 20 net tons or more includes registration, enrollment and license. 46 C.F.R. § 67.01–1. The term "documented" is defined in the Customs Regulations as "registered, enrolled and licensed . . . by the U. S. Coast Guard". 19 C.F.R. § 4.0(b).

A foreign-built yacht owned by a citizen of the United States may be documented if over 20 tons and "used exclusively as a pleasure vessel". It can be enrolled as a yacht and documented un-

---

3. My statement was based on language in *the Conqueror,* 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937.

der a "consolidated certificate of enrollment and yacht license". See 46 C.F.R. §§ 67.01–5(i); 67.67–1; 67.01–3(b). Craig did not plan to use the "Cruz del Sur" for pleasure purposes. His intended use was commercial. Even if the vessel had been enrolled and licensed by Ships of the Sea as a pleasure yacht, Craig still could not have furnished a recordable preferred ship mortgage after purchasing same. Under the Ship Mortgage Act, "documented" means "registered or enrolled or licensed under the laws of the United States" and "vessel of the United States" means any vessel documented under our laws. 46 U.S.C. § 911(2), (4). "No mortgage shall be accepted for recording unless the vessel it covers was documented as a vessel of the United States at the time the mortgage was made." 46 C.F.R. §§ 67.-47–7; 67.49–1(b); also 46 U.S.C. §§ 921, 922, 926.

■ Thus, only vessels owned by citizens of the United States can be documented under federal law. Without documentation, a preferred ship mortgage cannot be recorded. Since an alien shipowner cannot document a vessel, he is unable to deliver a preferred mortgage enforceable by the holder in the admiralty courts of this country.

## VI

### *Craig's Contentions as to the Preferred Ship Mortgage*

(A) After testifying at the hearing in the Municipal Court hearing that "a foreign vessel cannot be 'registered' in the United States in any way, shape or form", Craig added, "I've been through this with the Coast Guard up and down the West Coast of the United States. . . . I am a Canadian citizen but I am a resident alien of the United States. I have been for 5 years and I can be an American citizen in 3 weeks." Tr., Municipal Court hearing, pp. 55–56.

At the trial in this Court Mr. Craig testified that he never had any intention of documenting the vessel in the United States. He claimed that there was "a clear understanding" that it was either the United States or Fiji and that the conversation focused entirely on the latter arrangement.

Lane Morrison testified that he explained to Craig during the negotiations that he was a citizen of Canada (as was his corporation) and that what was going to be required was a preferred ship mortgage which an alien shipowner could not furnish.[4] According to seller's attorney, Craig replied that there was no problem; his lawyers in Canada could take care of it. Morrison denied that Mr. Craig informed him that he did not intend to document the vessel in the United States. He said that it was his plan to take the vessel down the Florida coast, charging admissions at various ports before sailing for the Fiji Islands. Since it would be a year before the vessel reached the South Seas, Morrison did not object to her being documented under the laws of that jurisdiction. He assumed, however, that Craig would furnish the required preferred ship mortgage at the time of closing. The only reference to Fiji is found in the clause thereof which says:

"Immediately after the closing, and prior to delivery of the Ship to Craig, Craig will obtain new documents for the Ship, the date of said new documents will be inserted as the date of the Mortgage and the same recorded by Craig. Craig will provide for the United States Coast Guard (or the Fiji Islands Coast Guard) to confirm to SOS that Mortgage has been recorded and thereupon SOS will deliver the Ship to Craig at Savannah, Georgia."

This language is antipodal to any theory that Craig could wait until he got to

4. In the affidavit filed by Mr. Craig in connection with the motion for summary judgment he stated that he was "never informed of any complications in connection with the transfer of this vessel insofar as his not being able to register the vessel in the United States. . . ."

the Fijis and record at Suva a British ship mortgage in place of the stipulated United States preferred mortgage. Such a reading would pervert basic covenants protecting the seller.[5] What it would mean is that Craig could sail out of Savannah, leaving behind nothing more than a promissory note of his corporation (which had small financial resources) secured only by a common law mortgage, without having taken out the required insurance on a vessel which he said cannot now be reproduced for a million and a half dollars. The cleverest semanticist in the field of exegesis cannot juggle words artfully enough to justify any such interpretation of the contract.

■■ (B) It is true that in the case of a written contract all the attendant and surrounding circumstances can be proven and if there is an ambiguity, parol evidence is admissible to explain it. But parol evidence cannot be employed to add to, take from, or vary the terms of the written instrument. Ga. Code Ann. §§ 20–704(1); 38–501 and 502; *Molly Pitcher Canning Company v. R. H. Smalling's Sons, Inc.*, 129 Ga.App., 742, 200 S.E.2d 908; *Stone Mountain Scenic Railroad, Inc. v. Stone Mountain Memorial Association*, 230 Ga. 800, 808–809, 199 S.E.2d 216; Greene, *The Georgia Law of Evidence* § 205. A contract of sale merges prior negotiations and all oral understandings and the court cannot rewrite the agreement to suit one of the parties.

■■ As written, the contract permits no British "equivalent" of a United States preferred mortgage to be recorded in the Fiji Islands. To justify reformation of a contract on the ground of mistake it must be a mutual one preventing expression of the true agreement of the parties. *Hunnicutt v. Archer*, 163 Ga. 868, 137 S.E. 253; *DeLong v. Cobb*, 215 Ga. 500, 502–503, 111 S.E. 2d 89.

### VII

### *Uniform Commercial Code*

■ An agreement to sell a vessel is not a maritime contract and is not cognizable in admiralty. *R. C. Craig Limited v. Ships of the Sea Incorporated, supra*, 345 F.Supp. at 1073; *Puamier v. Barge BT 1793*, 395 F.Supp. 1019, 1029 (E.D., Va.).

The governing law as to the *sale* is Article 2 of the Georgia Uniform Commercial Code.

■ (1) Craig contends that Ships of the Sea was under the duty to furnish a clean title, transferred in a rightful manner, so that it would not be exposed to a lawsuit to protect its title. Plaintiff says that a proper document of title accompaning the vessel would have enabled it to obtain a British equivalent of the United States preferred ship mortgage and record it in the Fijis. Defendant's failure to cooperate to that end constituted, Craig argues, a breach of Article 2 of the Commercial Code of Georgia. Under § 2–311 thereof, where the cooperation of one party is necessary to the agreed performance of the other party and is not seasonably forthcoming, the latter may be excused for resulting delay in his own performance. Ga. Code Ann. § 109A–2–311.

To be sure, the documentation of defendant's 150 ton, seagoing barkentine left a great deal to be desired. It consisted of a Georgia Motorboat Certificate good for local waters.[6] But that is

---

5. Under the contract, buyer could not register under a foreign flag without the consent of the seller and no change in registry would be allowed which impaired the latter's rights under "the mortgage". The term refers to the United States preferred ship mortgage,

6. Lane Enterprises bought the "Cruz del Sur" in 1965 from Twentieth Century Fox Film Corporation. The vessel was then registered in the Bahamas. Upon the sale to a United States citizen, that registry was officially cancelled. Mr. Lane endeavored to get the matter of the Bahamas documentation straightened out but was unable to do so.

not the point. The *buyer* was required under the contract to obtain "new documents for the Ship". Plaintiff's inability to perform was not caused by seller's failure to have had or to obtain United States documentation for the "Cruz del Sur". Craig's alien status precluded documenting the vessel in this country; the want of documentation prevented performance as to the preferred ship mortgage.

■■■ (2) In seeking specific performance, the complaint prayed that all requirements as to a preferred ship mortgage be removed from the contract since any non-performance by buyer was the fault of the seller and excused purchaser from performance of such clause. The Order of this Court denying defendant's motion for summary judgment (345 F.Supp. 1075) states:

> "I do not think that impossibility amounts to performance save where it is set up as a defense. The decision of the United States Supreme Court in *Smoot's Case* [15 Wallace 36, 21 L. Ed. 107] is an old one but it lays down what I conceive to be a sound rule. The Court said that impossibility of performance may be a defense to an action but that it 'does not stand for performance so as to enable such party to sue and recover as if he had performed.' "

Under Georgia law, where an Act of God makes performance impossible, such impossibility is a *defense* equivalent to performance. Ga. Code Ann. § 20–1102. The Uniform Commercial Code does not expressly refer to "impossibility of performance". However, general principles relating to that area of law are incorporated, with some qualifications, under the headings of "Substituted performance" (§ 109A–2–614) and "Excuse by failure of presupposed condition" (§ 109A–2–615). Neither of these sections supports Craig's claim that he could furnish a British ship mortgage as the equivalent of the required security in-

strument an alien owner could not provide.

Under § 109A–2–614(2), a seller may withhold or stop delivery when "the means or manner of payment fails because of domestic or foreign governmental regulation" unless the buyer provides a means of payment which is a commercially "substantial equivalent". This section deals with instances in international trade where a buyer cannot make payment in seller's currency as a result of some governmental regulation. See 67 Am.Jur.2d Sales § 411. It has nothing to do with this case.

Section 2–614(2) of UCC relates to delay of delivery by a seller where agreed performance of a contract of sale is rendered impracticable by a contingency the non-occurrence of which was a basic assumption on which the agreement was made. This provision provides that the delay of the *seller* to deliver in such a case is not a breach of his duty under the contract. This section is inapplicable here.

■■■ (3) Equally meritless is plaintiff's argument that where a clause of a contract is unconscionable as a matter of law, enforcement thereof may be refused by the court or it may enforce the remainder of the agreement without the offending provision. Ga. Code Ann. § 109A–2–302. According to the Official Comment, "unconscionable" means "one-sided contracts". See 1 Anderson's Uniform Commercial Code §§ 2–302:3 through 2–302:7.

The contract of sale of the "Cruz del Sur" was negotiated at arm's length. Buyer was not represented by counsel but its principal officer was knowledgeable in the documentation of foreign vessels. The requirement of a recordable United States preferred ship mortgage was reasonably related to the business risks involved and was necessary for the protection of seller's interest. It was not unconscionable in law or fact.

## VIII

### *The Obligation to Insure*

Under the contract of July 20, 1971, the buyer agreed that so long as any portion of the principal or interest of the note should remain unpaid, it would obtain and maintain, in a company acceptable to the seller, hull insurance in an amount not less than 110% less than the unpaid balance. Purchaser also agreed to carry protection and indemnity insurance in a company satisfactory to seller with limits of $500,000. Ships of the Sea was to be named therein as an additional insured.

Mr. Craig testified in this Court that he "checked" the matter of insurance with a Savannah agency prior to the closing. The only source for this coverage is Lloyds in London and in the few days remaining before closing the sale there was no possiblity, he said, of procuring the insurance. In the affidavit Mr. Craig furnished this Court in February, 1972, he said that "he clearly understood the contract to state that, in the event he did not insure the vessel, that the sellers would insure said vessel." This is not a permissible interpretation of paragraph 2(e) of the contract. Insurance was mandatory on the buyer's part. It was merely optional by seller in the event purchaser failed to take out insurance. The provision in the contract permitting seller to do so at buyer's cost does not mean that purchaser had a reasonable time after the closing to comply.[7]

It is true that satisfactory evidence as to the insurance policy was not specifically designated as one of the documents to be delivered at the closing. But the meaning of the insurance provision is plain enough. The vessel was to be covered by hull and P & I insurance obtained and maintained by the purchaser "so long as any portion of the principal or interest of the Note shall remain unpaid". Even had Craig complied with its obligation as to the preferred ship mortgage, the failure to obtain insurance was a material breach authorizing seller to refuse to consummate the sale.

### ORDER

Questions of law dominate in this case. The trial served mainly to round out and supplement evidence already before the Court on defendant's motion for summary judgment. The basic facts are not in dispute. The factual controversy relates almost wholly to the Fiji angle. That area of dispute loses significance in view of my ruling that the contract is unambiguous. The findings and conclusions made in this Opinion comply sufficiently with Rule 52(a) and need not be formalized. To restate the basic rulings herein:

The buyer's inability, because of alienage, to document the vessel and its consequent failure to tender at the closing a recordable United States preferred ship mortgage constituted a material breach of the contract of sale. So did plaintiff's failure to obtain required insurance. Such non-performance was not excused under law or in fact. The contract is not ambiguous and cannot be altered or reformed to accord with alleged oral understandings conflicting with the written instrument. The breach by the buyer justified seller in refusing to consummate sale of the vessel.

Judgment will be entered in favor of the defendant, Ships of the Sea Museum, Inc.

---

7. In the affidavit referred to above Craig explained that he intended to take out the insurance upon receiving from the seller "a clear registered title to the vessel".